**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
Jeffrey M. Rosenfeld (Bar No. 222187)
Leah Rosa Vulic (Bar No. 343520)
548 Market St. #85399
San Francisco, CA 94102
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
jeff@kr.law
leah@kr.law

Attorneys for Movants/Defendants Does

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.** | Case No. 3:25-mc-80296 |
| | (Case No. 2:25-cv-05564-WLH-PD, Pending in Central District of California) |
| | **MOVANTS DOE DEFENDANTS' NOTICE OF MOTION AND MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Date:      TBD |
| | Time:      TBD |
| | Ctrm:      TBD |
| | Before:    TBD |

KRONENBERGER ROSENFELD

Case No. 3:25-mc-80296

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................ 1

INTRODUCTION: Everybody Hates a Critic ........................................................... 1

STATEMENT OF ISSUES ......................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 2

    A.  TEI, Ethan Klein, Hasan Piker, and Denims: A Web of Reactionary Content ............. 2

    B.  The H3Snark Subreddit: A Safe and Anonymous Space for Criticism of H3 ............... 3

    C.  Ethan lays a trap: *Nuke* and *Countdown* ................................................. 6

        1.  TEI promotes *Nuke* heavily as a controversial piece, and registers copyrights. ....... 6

        2.  Denims live-reacts; Does facilitate safe criticism and foster conversation. ............. 7

    D.  The Instant lawsuit and Subpoenas .......................................................... 8

        1.  Complaint Allegations, Procedural Background, and Subpoenas ......................... 8

        2.  The Falsity of TEI's Allegations Against Does ........................................... 9

        3.  The Complaint and Ethan's own words show bad faith and pretext. .................... 10

        4.  Does face real harm and retaliation if unmasked; discourse will be silenced. ....... 11

ARGUMENT ........................................................................................................... 13

I.     Legal Standard ............................................................................... 12

    A.  Quashing a Subpoena Generally .............................................................. 12

    B.  Standard for Unmasking Anonymous Speaker .............................................. 13

        1.  Motion to Dismiss Analysis (*Seescandy*) ............................................... 14

        2.  Real Evidentiary Basis (*Highfields*) .................................................... 14

        3.  *Highfields* test applies here. ............................................................. 15

II.    TEI cannot meet is initial burden. ............................................................ 16

    A.  TEI has not stated—and cannot substantiate—a claim for contributory infringement.  16

        1.  TEI cannot show requisite knowledge for contributory infringement. ................. 16

        2.  TEI cannot show that Does induced, caused, or materially contributed to any direct infringement. ............................................................................ 18

        3.  Does' Megathreads were fair use. ......................................................... 20

KRONENBERGER ROSENFELD

B. Denims' use was fair use. ............................................................................. 20

    1.  Denims' use was transformative and does not supersede the original use. .......... 21

    2.  TEI's highly factual works supports greater dissemination. .................................. 22

    3.  Denims' use did not negatively impact the market; it increased it. ...................... 22

    4.  Stripping unoriginal elements, TEI's thin copyrights deserve little protection. ..... 24

III.    Even if TEI had met its initial burden, the balance of harms weighs in favor of Does ........................................................................................................................ 24

IV.    If Does' motion is not granted, Does request a protective order. ............................... 25

V.    Does Reserve their right to seek their attorney's fees. ................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KRONENBERGER ROSENFELD

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ................................................................... 23

*Apple Computer, Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994) ..................................................................... 24

*Art of Living Found. v. Does 1-10*,
2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) .............................. 15, 24, 25

*Atari Interactive, Inc. v. Redbubble, Inc.*,
515 F. Supp. 3d 1089 (N.D. Cal. 2021) ..................................................... 17

*Awtry v. Glassdoor, Inc.*,
2016 WL 1275566 (N.D. Cal. Apr. 1, 2016) ...................................... 17, 24

*Baugher v. GoDaddy.com LLC*,
2021 WL 4942658 (D. Ariz. Oct. 22, 2021) ...................................... 15, 16

*BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*,
644 F. Supp. 3d 602 (C.D. Cal. 2022) ....................................................... 16

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .................................................................... 20, 21, 23

*Columbia Ins. Co. v. seescandy.com*,
185 F.R.D. 573 (N.D. Cal. 1999) .............................................................. 14

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ............................................................ 18, 19

*Columbia Pictures v. Bunnell*,
2006 WL 5383789 (C.D. Cal. May 10, 2006) ........................................... 17

*Does I thru XXIII v. Advanced Textile Corp.*,
214 F.3d 1058 (9th Cir. 2000) ................................................................... 25

//

Case No. 3:25-mc-80296    iii    **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

*Eldred v. Ashcroft*,

   537 U.S. 186 (2003) ........................................................................................................ 20

*Equals Three, LLC v. Jukin Media, Inc.*,

   139 F. Supp. 3d 1094 (C.D. Cal. 2015) ...................................................................... 22

*Ets-Hokin v. Skyy Spirits, Inc.*,

   323 F.3d 763 (9th Cir. 2003) ........................................................................................ 24

*Fonovisa, Inc. v. Cherry Auction, Inc.*,

   76 F.3d 259 (9th Cir. 1996) .......................................................................................... 19

*Glass Egg Digital Media v. Gameloft, Inc.*,

   2019 WL 2499710 (N.D. Cal. June 17, 2019) ........................................................... 13

*Google LLC v. Oracle Am., Inc.*,

   593 U.S. 1 (2021) ............................................................................................... 21, 23

*Harper & Row Publishers, Inc. v. Nation Enters.*,

   471 U.S. 539 (1985) ...................................................................................................... 22

*Highfields Cap. Mgmt., L.P. v. Doe*,

   385 F. Supp. 2d 969 (N.D. Cal. 2005) ................................................................ 14, 15

*Highfields Cap. Mgmt., L.P. v. Doe*,

   2005 WL 8188026 (N.D. Cal. May 31, 2005) ............................................................ 26

*In re Anonymous Online Speakers*,

   661 F.3d 1168 (9th Cir. 2011) ...................................................................................... 14

*In re DMCA Subpoena to Reddit, Inc*.,

   441 F. Supp. 3d 875 (N.D. Cal. 2020) ........................................................................ 20

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*,

   608 F. Supp. 3d 868 (N.D. Cal. 2022) ........................................................... 13, 21, 24

*In re Gliner*,

   133 F.4th 927 (9th Cir. 2025) ...................................................................................... 13

*In re PGS Home Co. Ltd.*,

   2019 WL 6311407 (N.D. Cal. Nov. 25, 2019) .......................................................... 16

KRONENBERGER ROSENFELD

*Kavanaugh v. Klein*,

   2025 WL 999183 (Cal. Ct. App. Apr. 3, 2025) ......................................................... 11

*Kechara House Buddhist Ass'n Malaysia v. Does*,

   2015 WL 5538999 (N.D. Cal. Sept. 18, 2015) ........................................................ 16

*Keen v. Bowley*,

   2024 WL 3259040, n. 59 (C.D. Cal. July 1, 2024) .................................................... 3

*Lenz v. Universal Music Corp.*,

   815 F.3d 1145 (9th Cir. 2016) .......................................................................... 20, 21

*Los Angeles News Serv. v. CBS Broad., Inc.*,

   305 F.3d 924 (9th Cir.) ........................................................................................ 23

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,

   658 F.3d 936 (9th Cir. 2011) .......................................................................... 18, 19

*Luvdarts, LLC v. AT & T Mobility, LLC*,

   710 F.3d 1068 (9th Cir. 2013) .................................................................. 16, 17, 18

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,

   545 U.S. 913 (2005) ....................................................................................... 18, 19

*Monge v. Maya Magazines, Inc.*,

   688 F.3d 1164 (9th Cir. 2024) ............................................................................. 23

*Music Grp. Macao Com. Offshore Ltd. v. Does*,

   82 F. Supp. 3d 979 (N.D. Cal. 2015) .............................................................. 24, 25

*Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*,

   753 F. Supp. 3d 933 (C.D. Cal. 2024) ................................................................. 23

*Perfect 10, Inc. v. Amazon.com, Inc.*,

   508 F.3d 1146 (9th Cir. 2007) ...................................................................... 16, 20

*Perfect 10, Inc. v. Giganews, Inc.*,

   2015 WL 1746406 (C.D. Cal. Mar. 6, 2015) ........................................................ 17

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,

   494 F.3d 788 (9th Cir. 2007) ........................................................................ 16, 18

KRONENBERGER ROSENFELD

Case No. 3:25-mc-80296        v        **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

*Perry v. Schwarzenegger*,

   591 F.3d 1126 (9th Cir. 2009) ................................................................. 13

*Robinson v. Binello*,

   771 F. Supp. 3d 1114 (N.D. Cal. 2025) ..................................................... 16

*Schneider v. YouTube, LLC*,

   649 F. Supp. 3d 872 (N.D. Cal. 2023) ....................................................... 18

*Seltzer v. Green Day, Inc.*,

   725 F.3d 1170 (9th Cir. 2013) ................................................................. 21

*Signature Mgmt. Team, LLC v. Automattic, Inc.*,

   941 F. Supp. 2d 1145 (N.D. Cal. 2013) ..................................................... 25

*Sobhani v. @Radical.Media Inc.*,

   257 F. Supp. 2d 1234 (C.D. Cal. 2003) ..................................................... 24

*Sony Music Ent. Inc. v. Does 1-40*,

   326 F. Supp. 2d 556 (S.D.N.Y. 2004) ....................................................... 15

*Tarantino v. Gawker Media, LLC*,

   2014 WL 2434647 (C.D. Cal. Apr. 22, 2014) ........................................... 16

*VHT, Inc. v. Zillow Grp., Inc.*,

   918 F.3d 723 (9th Cir. 2019) ................................................................. 19

*YZ Prods., Inc. v. Redbubble, Inc.*,

   545 F. Supp. 3d 756 (N.D. Cal. 2021) ................................................. 17, 18


**Statutes**

17 U.S.C. §107 .......................................................................... 20, 21, 22

18 U.S.C. §2701 ........................................................................... 9

47 U.S.C. §230 ........................................................................... 5


**Rules**

Fed. R. Civ. P. 26 ..................................................................... 13, 25

KRONENBERGER ROSENFELD

1

Fed. R. Civ. P. 45 ................................................................................................................ 13, 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that, on a date and time to be determined, Movants/Defendants Does ("Does") will and hereby do move this Court to quash subpoenas issued by Plaintiff Ted Entertainment, Inc. ("Plaintiff" or "TEI") to non-parties Reddit, Inc. ("Reddit") and Discord, Inc. ("Discord") (the "Subpoenas"). The Subpoenas seek identifying information for numerous Reddit and Discord accounts in Plaintiff's civil action filed in the District Court for the Central District of California on June 19, 2025, *Ted Entertainment, Inc. v. Alexandra Marwa Saber and Does 1-10*, Case No. 2:25-cv-05564-WLH-PD (the "Action").

TEI's subpoenas should be quashed because: 1) TEI has not and cannot state a claim against Does for contributory copyright infringement; and 2) the balance of equities weighs in favor of Does' anonymity and quashing TEI's Subpoenas in their entirety. Does request that this Court quash the Subpoenas with prejudice, or in the alternative, enter a protective order; award attorney's fees; and grant such further and other relief as the Court deems just and proper.

**INTRODUCTION: Everybody Hates a Critic**

On its face, the Action is about copyright infringement. At its heart, however, the Action is about stifling criticism and seeking retribution by unmasking individuals for perceived reputational harms TEI attributes to Does, unrelated to TEI's intellectual property rights.

TEI publishes the H3 Podcast, a popular live comedy and commentary podcast hosted primarily by Ethan Klein. This Motion arises from TEI's attempt to compel disclosure of Does' identities in the Action, where TEI has sued Denims, a Twitch streamer, and Does 1-10, who are or were moderators of a subreddit[1] critical of TEI, its owners, and their H3 Podcast. TEI purportedly seeks to hold Does accountable for alleged contributory copyright infringement for posting links to Denims' Twitch channel, on which Denims live-reacted to TEI's public content. In reality, TEI has not and cannot allege facts stating a claim for contributory infringement against Does, and the Action and Subpoenas are a thinly veiled pretext for obtaining Does' identities in order to expose, punish, and dox Does for their roles as moderators of the critical subreddit, H3Snark.

---

[1] A subreddit is a smaller community within Reddit, created and moderated by other Reddit users. https://support.reddithelp.com/hc/en-us/articles/204533569-What-are-communities-or-subreddits.

TEI improperly seeks to use the Court's subpoena authority not for legitimate discovery, but to unmask and intimidate anonymous Does, whose only action was hosting lawful, critical discussions of H3 and its content. The Subpoenas broadly demand account information from Reddit and Discord despite clear facts that: (a) none of the Does uploaded, distributed, or provided copies of the allegedly infringed works; (b) the posts that TEI alleges constitute unlawful contributory copyright infringement, were created to centralize critical discussion and provided URLs to publicly-accessible Twitch and YouTube user channels, which Does understood would host only fair use commentary; and (c) no evidence exists of any coordination between the Does and Denims, or between the Does and any other Twitch or YouTube streamers. Additionally, Denims' allegedly infringing Twitch stream itself constituted fair use of an already very thin copyright registration.

This matter transcends copyright concerns. It directly implicates whether powerful entities can exploit judicial mechanisms to silence anonymous critics. At stake is the fundamental First Amendment right to anonymous speech on public matters—a right the Supreme Court has recognized as essential. Allowing TEI's Subpoenas would subject Does to significant harassment, reputational harm, and professional repercussions solely for engaging in lawful speech. More broadly, allowing the Subpoenas will send a chilling message to internet moderators and commenters: criticize wealthy and influential individuals, and risk being unmasked in federal court.

## STATEMENT OF ISSUES

1) What legal standard applies when a plaintiff seeks to unmask anonymous speakers engaged in First Amendment-protected criticism, under the guise of a contributory copyright infringement claim?

2) Has TEI established a cause of action against Does sufficient to warrant unmasking?

3) Even if TEI has established a cause of action against Does, do balancing factors, both public and private, weigh in favor of TEI's ability to unmask Does?

## STATEMENT OF FACTS

**A.    TEI, Ethan Klein[2], Hasan Piker, and Denims: A Web of Reactionary Content**

---

[2] Because Ethan and Hila share the same last name, this motion refers to them by their first names to avoid confusion; no disrespect is intended. *See Keen v. Bowley*, 2024 WL 3259040, at *7, n. 59 (C.D. Cal. July 1, 2024).

KRONENBERGER ROSENFELD

Ethan Klein ("Ethan") is an Israeli-American YouTuber and podcaster, best known as the host of the H3 Podcast and co-creator of the YouTube channel h3h3Productions, with his wife Hila Klein ("Hila"). (Vulic Decl. Ex. A ("Compl.") ¶¶12, 25.) Together, Ethan and Hila own Plaintiff TEI[3], a production company that broadcasts the H3 Podcast. (Compl. ¶¶12, 15.) Ethan is frequently in the public eye for his outspoken views, online controversies, and social media presence, maintaining over 5.7 million subscribers on his primary channel. (Doe Decl. ¶¶3, 5, 11, 14, 20, 97, 110, 159, 173, 174.)

Ethan formerly collaborated with Hasan Piker, another high-profile online content creator, as co-hosts on the "Leftovers" series on YouTube. (Compl. ¶24.) Ethan and Piker's partnership drew a large following due to their contrasting backgrounds and lively debates on internet issues, politics, and news. (Doe Decl. ¶7.) Their relationship soured over deepening political disagreements, especially regarding the Israeli-Palestinian conflict and the events following October 7, 2023. (Compl. ¶27.) After the podcast's end, their relationship declined as public criticism and social media jabs escalated into a highly public feud. (Doe Decl. ¶16.) They have exchanged critical videos, hosted a live debate in May 2025 that drew widespread attention, and discussed each other's platforms and communities, often highlighting and criticizing each other's political views on the Israeli-Palestinian conflict. (Doe Decl. ¶7.)

Twitch streamer Alexandra Marwa Saber ("Denims"), is an online content creator and streamer, known for Twitch live streams and commentary, focusing on reaction content and debates on internet culture and politics. (Doe Decl. ¶20[4].) Denims is one of many critics of Ethan, Hila, and H3, and often discusses H3, its views, and controversies on her live stream. (Doe Decl. ¶20.) Denims is an associate of Piker. (Doe Decl. ¶37.)

**B.    The H3Snark Subreddit: A Safe and Anonymous Space for Criticism of H3**

Reddit is a website and message board home to thousands of communities, designed to bring users together in honest conversations, fostered by its users' abilities to speak anonymously. (Vulić Decl. Exs. 13, 14.) Reddit users communicate and engage through communities called "subreddits."

---

[3] Ethan, Hila, and TEI, and their podcast, may be collectively referred to herein as "H3."
[4] *See also* https://www.twitch.tv/denims/about.

KRONENBERGER ROSENFELD

1  (Vulić Decl. Ex. 15.) Moderators (mods) are unpaid volunteers who set community rules, norms,

2  and expectations for subreddits, to ensure Reddit's Rules are enforced; mods also remove

3  inappropriate content and facilitate discussions. (Doe Decl. ¶¶4, 15, 19, 123, 131, 170, 195, 213,

4  214, 215, 252, 273, 292; Vulić Decl. Exs. 14, 16, 17.)

5      A subreddit about H3 was created on April 30, 2023 for "fallen fans" of H3 to safely criticize

6  H3, Ethan, and related topics ("H3Snark" or "Subreddit"). (Vulić Decl. Exs. 18, 19.) Fans of H3

7  were systematically banned from the official H3 subreddit of 580,000+ members when they made

8  critical comments; Ethan and Hila are the head mods of this official H3 subreddit. (Doe Decl. ¶¶25,

9  29, 173, 211, 252.) Banned users thus used alternative spaces, like r/h3snark, to freely discuss and

10  critique Ethan's increasingly controversial statements about politics, world events, or popular culture

11  topics, and his feuds with other creators and former co-hosts. (*Id*. ¶¶8, 9, 10, 13, 114.) Thus, H3Snark

12  emerged as a moderated subreddit with rules designed to foster a safe space for engaging in critical

13  discussions related to H3 without censorship. (*Id*. ¶¶15, 195, 210, 211, 252, 291, 293.)

14      Does are or were moderators of H3Snark. (Doe Decl. *passim*.) Given the Subreddit's

15  population of "fallen fans" of H3, its moderators found it essential to ensure an environment free

16  from harassment. (*Id*. ¶¶19, 114, 170, 195, 291.) The mods created rules, set up systems and pages,

17  programmed AutoMod code, and configured apps to assist moderation. (*Id*. ¶¶15, 123, 170, 200,

18  214, 215, 219, 271.) Rules on what could be discussed on H3Snark were firm and principled on

19  civility. (*Id*. ¶¶15, 19, 170, 195, 196, 213, 292.) The mods aimed to foster a friendly and positive

20  community where people did not harass others based on personal traits. (*Id*. ¶¶15, 170, 195, 213,

21  221, 270, 291, 292.) Instead, discussions centered on actions or statements made on the H3 Podcast,

22  including concerns about Ethan's use of offensive language, including racial slurs, sexism, racism,

23  and homophobia. (*Id*. ¶¶170, 221, 270.) The mods' efforts were guided by a sincere commitment to

24  maintaining constructive dialogue, and they received positive feedback from many community

25  members who appreciated the respectful environment. (*Id*. ¶¶170, 213, 222.)

26      Does also took copyright infringement seriously, consistently taking steps to comply with

27  copyright and fair use laws. (*Id*. ¶¶62, 131, 217, 219, 254.) Mods actively removed infringing

28  content, regularly updated their policies, reached out to Reddit admins for guidance, and even

consulted a lawyer to ensure that content shared on the Subreddit remained copyright compliant. (*Id*. ¶¶15, 62, 117, 213, 214, 217, 218, 219.) After October 2024, the Subreddit banned references and links to alternative viewing websites. (*Id*. ¶¶61, 117, 118, 119, 214; Vulić Decl. Ex. 19.) Further, mods created an automated copyright disclaimer, which automatically attached to every single post on the Subreddit ("AutoMod Disclaimer"). (Doe Decl. ¶¶32, 50, 133, 200, 219.)

While mods can set community guidelines, they are not responsible for content posted by Subreddit users. (Doe Decl. ¶15.) Despite this, Ethan has for some time accused the Subreddit and its mods of defaming him, harassing him, engaging in hate crimes against him, and later—after the Subreddit was inactive—sending both Child Protective Services and human skulls to his house. (Doe Decl. ¶¶154, 171, 180, 231, 232, 233, 234; Vulić Decl. Ex. 38.)

To be clear, **Does are not responsible in any way for the atrocious behavior described above, or any instance of harassing or defaming Ethan or H3.** (Doe Decl. *passim*.) Yet, Ethan and H3 have repeatedly attributed such atrocious conduct to Does, and have repeatedly made threats toward and against Does *on the H3 Podcast*. (Doe Decl. *passim*; Vulić Decl. Exs. 21, 22, 24, 41.)

Despite Ethan's claims against Does being false, inaccurate, and/or entirely unsubstantiated, Ethan's attacks on Does are integral to the H3 Podcast, and prime the H3 audience to believe that any and all actions Ethan takes against the Does are justified. (Doe Decl. ¶¶190, 231.) Ethan explicitly uses his podcast to incite his fans against the mods of H3Snark. (Doe Decl. ¶¶172, 231.) Indeed, H3 fans and supporters themselves, incited and emboldened by Ethan, have launched multiple threats against the H3Snark mods. (Doe Decl. ¶¶151, 179, 231, 245.)

In addition to actual threats and incitement, H3 has repeatedly threatened to sue Does. In 2023, these threats escalated, including warnings that Ethan would involve the FBI and pursue legal action for defamation and hate speech. (Doe Decl. ¶¶172, 223; Vulić Decl. Ex. 40.) But Ethan has not brought such lawsuits, because: 1) Does are immune from liability for the actions of the Subreddit users under 47 U.S.C. §230 (Doe Decl. ¶15, 69; Vulić Decl. Ex. 38), and 2) Does' speech is highly protected First Amendment speech, and any legal action against the H3Snark mods under traditional tort theories is subject to strict scrutiny and free speech protections, such as California's anti-SLAPP statute, CCP §425.16. Ethan has also threatened to uncover the H3Snark mods'

1    identities using digital forensics investigators. (Doe Decl. ¶¶70.1, 223, 258.)

2        Ethan's intentions are clear. He has repeatedly expressed his eagerness to expose Does to

3    their friends, family, workplaces, and schools. (Doe Decl. ¶¶65, 66, 73.1, 197.5, 224, 261, 277; Vulić

4    Decl. Exs. 21.) He even admitted on his podcast to creating his own subreddits to harass Does and

5    the Subreddit. (Doe Decl. ¶¶198, 224, 279.) Reddit itself has found H3-controlled subreddits guilty

6    of harassment on its platform. (Doe Decl. ¶196; Vulić Decl. Ex. 25.)

7    **C.    Ethan lays a trap: *Nuke* and *Countdown***

8        **1.    TEI promotes *Nuke* heavily as a controversial piece, and registers copyrights.**

9        Ethan and Hila, through TEI, created the motion picture *Content Nuke: Hasan Piker*

10    ("*Nuke*"), ostensibly to combat a tsunami of hateful rhetoric regarding the Israeli-Palestinian conflict

11    and the Gaza War, and Piker's role in the surrounding discussion. (Compl. ¶37.) *Nuke* was written,

12    shot, and edited from December 2024 through January 2025. (Compl. ¶38.) TEI submitted a

13    copyright registration application with the United States Copyright Office (the "USCO") for *Nuke*

14    on January 27, 2025 (four days before *Nuke* was publicly released). (Compl. ¶38.) According to TEI,

15    *Nuke* is a "tragi-comic documentary critiquing Hasan and Twitch," comprised of "original footage,

16    highly edited montages, parodic skits and archival matters." (Compl. ¶40.) *Nuke* is largely

17    compromised of informational elements—*i.e.*, facts, history. (Compl. Exs. D, E.) *Nuke*'s copyright

18    registration excludes the "preexisting footage, preexisting photograph(s), and preexisting music" the

19    film uses from other publications, and those elements are present in a staggering amount. (Vulić

20    Decl. Exs. 5-6; Compl. Exs. D, E; Doe Decl. ¶¶136-144.) Indeed, of the 1 hour, 42 minutes, and 5

21    second-running time of *Nuke*, approximately 5 minutes, 58.5 seconds contains *only* original or new

22    TEI content (accounting for ~5.58% of the total video), and about 1 minute, 1.5 seconds of *Nuke*

23    consists of *only* new TEI content (~1% of the video). (Doe Decl. ¶¶136-143.)

24        Before its release, Ethan built up public interest in *Nuke* by discussing it on the H3 Podcast.

25    (Compl. ¶43.) With the public interest in *Nuke* came an equal interest in being able to comment on

26    or criticize it through safe channels. (Doe Decl. ¶¶17, 227, 228.) TEI-controlled spaces, such as the

27    H3 Podcast official YouTube channel's live chat and comments section, as well as the H3 official

28    subreddit, had grown increasingly hostile toward criticism. (*Id. passim.*)

KRONENBERGER ROSENFELD

On January 31, 2025, H3 hosted its regularly scheduled podcast, but the theme was purportedly to promote the release of *Nuke* ("*Countdown*"). (Compl. ¶41 & Compl. Ex. F.)[5] That same day, H3 published *Nuke* on its YouTube channel, which was publicly viewable. Following publication of *Nuke*, Ethan himself publicly broadcast *Nuke* in full on a continuous 24/7 loop on Twitch starting from March 5 to April 4, 2025. (Vulić Decl. ¶47 & Ex. 47.)

**2. Denims live-reacts; Does facilitate safe criticism and foster conversation.**

In advance of *Nuke*'s release, several streamers, including Denims, publicly stated that they planned to live-react to the film, *i.e.*, provide reactions and commentary while viewing *Nuke*. (Doe Decl. ¶¶23, 124.) The Subreddit received sharp increases in user submissions about anticipated reactions to *Nuke*, with community members expressing hesitation to watch it directly from H3/TEI (out of fear of retaliation) and a desire to collectively react through alternate streams that aligned with the Subreddit's atmosphere. (*Id.* ¶¶122, 124.) To manage this activity surge, and to consolidate discourse about *Nuke* and reactions to it in a safe space without retaliation, Does created "Megathreads" (standard, organized posts that aggregate discussions about specific events)[6], which had links to creators' public homepages (not to specific videos) who had *already announced their intent to react*. (*Id.* ¶¶34, 38, 40, 122, 124, 126-130, 228, 229.) The Megathreads were created for users to engage with the content indirectly while controlling traffic and maintaining community guidelines—in other words, discussion threads.

The First Megathread (Compl. Ex. G), posted Jan. 30, states Does' intentions of providing a space to discuss *Nuke* (titled "MEGATHREAD | Content Nuke - Where to Watch & Discussion"), to "react/comment/update" on the thread, while instructing users to abide by the Subreddit's rules, including those on copyright and fair use. (Doe Decl. ¶¶122, 131.) It included links to the channels of creators who had indicated that they planned to stream their reactions or post reaction videos in the coming days, including a link to Denims' Twitch channel. (*Id.*)

---

[5] Only *after* TEI discovered that Denims (and others) in fact did what Ethan prodded them to do—watch *Nuke* and react to it—did TEI register *Countdown* with the USCO. (Compl. ¶42.) TEI has never, before this year, registered copyrights in its broadcast or any other work before. (Vulić Decl ¶7, Ex. 7.)

[6] References to numbered Megathreads in this Motion correspond to numbered "Inducement Posts" in the Complaint; Does note that the Third Megathread was posted before the Second Megathread.

The Second Megathread (Compl. Ex. H), posted on January 31, three minutes after *Nuke* was released, offered "Places to watch *reactions* to this video" [emphasis added], and included links to live-reacting streamers as well as *H3's own live broadcast* of *Nuke*. (Doe Decl. ¶38.) The Third Megathread (Compl. Ex. I), posted on January 31, 2025, three minutes after *Countdown* began, hyperlinked to Denims' Twitch channel and included a pinned mod comment providing links to the other streamers who would be reacting. (Doe Decl. ¶33.)

The First Megathread was posted *before* release of *Countdown* and *Nuke*; the Third was posted before *Nuke*. (Doe Decl. ¶¶34, 121.) The Megathreads only link directly to official Twitch and YouTube user landing pages. (Compl. Exs. G-I.) The links contain **no unauthorized** mirrors, VODs (video on demand), or download links. (*Id.*) The sole purpose of these Megathread posts was to facilitate lawful, real-time commentary and critique; and each contained the AutoMod copyright disclaimer. (*Id.*; Doe Decl. ¶133; Vulić Decl. Ex. 45.)

Does themselves did not watch any of the streamers live-reacting, including Denims. (Doe Decl. ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.)

**D.    The instant lawsuit and Subpoenas**

On June 19, 2025, TEI filed three lawsuits: 1) the Action, 2) a lawsuit against Morgan Kamal Majed (Frogan) and Does in the C.D. Cal., Case No. 2:25-cv-05565, and 3) a lawsuit against Kacey Caviness (Kaceytron) and Does in the W.D. Mo., Case No. 4:25-cv-00459-LMC. Frogan and Kaceytron are also streamers who live-reacted to *Nuke*. (Vulić Decl. Exs. 3-4.)

**1.    Complaint Allegations, Procedural Background, and Subpoenas**

TEI alleges that Denims directly infringed on TEI's copyrights in *Nuke* and *Countdown*, by her reactions to both during her 10-hour stream on January 31, 2025[7]. (Compl. ¶¶2, 75-81, Compl. Exs. J-K[8].) TEI further alleges that Does committed contributory infringement by posting links to Denims' Twitch channel. (Compl. ¶¶3, 43-45, 75-81, Compl. Exs. G-I.)

---

[7] Denims answered the Complaint on August 14, 2025. (Vulić Decl. Ex. 12.) Among other defenses, Denims asserted that her use of the works was fair, that TEI had granted express or implied licenses, that TEI filed the Complaint with unclean hands, that TEI suffered no injury or damages, that the Complaint is barred by TEI's own inequitable conduct, and lack of notice. *Id.*

[8] Specific timestamps in the Complaint to Denims' stream do not appear to match the timestamps in the relevant Exhibits, J-K.

Before a Rule 26(f) conference, TEI and Denims agreed to allow TEI to take expedited discovery and serve the Subpoenas on Reddit and Discord. (Vulić Decl. Ex. 8.) The Central District of California judge granted their stipulation on July 31, 2025, signing the proposed order filed therewith without any modifications. (*Id.* Ex. 9.) On August 4, 2025, TEI issued the Subpoenas to Reddit and Discord. (*Id.* Exs. 10-11.) The Subpoenas broadly ask for identifying information for Does, and for all moderators of the Subreddit from Jan.1-Feb. 28, 2025.[9] (*Id.* ¶9, Exs. 10-11.)

### 2.    The Falsity of TEI's Allegations Against Does

TEI alleges three categories of conduct related to the H3Snark Subreddit: 1) "rampant" infringement, including posting of links to H3 content on YewTube (Compl. ¶¶29-33), 2) "fraudulent" DMCA counternotifications (Compl. ¶35), 3) the Megathreads (Compl. ¶44). Of these categories, only the Megathread allegations directly relate to the alleged inducement. TEI's allegations against Does are: 1) facially incorrect, 2) based on conclusory allegations and assumptions, or 3) not observations about Does at all.

First, the Complaint ignores the text and context of the Megathreads. The actual text of the Megathreads shows their purpose of providing a safe environment to discuss and criticize H3—*i.e.*, they were discussion threads. (Doe Decl. ¶¶6, 32, 33, 34, 44, 45, 122, 123, 125, 126, 227, 228, 229; Compl. Exs. G-I.) The links within the Megathreads were to each streamer's general channel, not to any specific content alleged to be infringing at the time of posting. *Id.* The Megathreads were posted in the Subreddit amidst ongoing debates, criticisms, and discussions of Ethan, Piker, and the political landscape in which those occurred. *Id.*

Second, the Complaint's allegations about Does' "knowledge" of alleged infringement are false, conclusory, and/or would require Does to be precognitive. The First Megathread was made before *Countdown* and *Nuke*, *i.e.*, before Denims reacted to them; the Third was posted before Denims reacted to *Nuke*. (Doe Decl. ¶¶33, 122; Compl. Exs. G, I.) No Doe watched Denims' stream. (Doe Decl. ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.) No Doe coordinated with Denims in any manner regarding Denims' streaming of *Nuke*. (Doe Decl. ¶¶21, 128, 169.) **TEI never notified Does**

---

[9] Facially, the Subpoenas ask for information that could be construed as violating the Stored Communications Act, 18 U.S.C. §2701, *et seq.* ("SCA"), and for non-mod information. TEI has agreed to limit the Subpoenas' requests so that the SCA is not implicated. (Vulić Decl. ¶9.)

KRONENBERGER ROSENFELD

1    **that it believed Denims' stream was infringing/not fair use, until it filed the Action.** (Doe Decl.

2    ¶¶31, 41; Compl. *passim*.)

3        Contrary to TEI's allegations: Does did not delete the Megathreads to "conceal" infringement;

4    these posts are still available online. (Vulić Decl. ¶45.) The Complaint and exhibits also fail to

5    acknowledge that the Second Megathread included a link to H3's actual live broadcast of *Nuke*. (Doe

6    Decl. ¶¶38-40; Compl. Ex. H.) The Megathreads were not posted amidst "rampant copyright

7    infringement" on H3Snark; Does discouraged copyright infringement, including through Subreddit

8    Rules and AutoMod Copyright Disclaimer, which the Complaint's Exhibits crop out. (Doe Decl. ¶¶50,

9    134, 217, 218, 219.) References to YewTube links are irrelevant to the alleged inducement; Does later

10   banned use of alt-viewing sites for unrelated reasons; and use of YewTube has not been found to

11   infringe copyrights. (Doe Decl. ¶¶61, 112, 113, 114, 115, 133; Vulić Decl. Ex. 46.) Does had nothing

12   to do with fraudulent DMCA counternotifications, which have no relation to the Megathreads; and

13   mods do not receive DMCA takedowns. (Compl. ¶35; Doe Decl. ¶¶54, 116, 118.)

14        **3.**      **The Complaint and Ethan's own words show bad faith and pretext.**

15        The Complaint includes numerous references to non-IP-related conduct, which TEI

16   associates with Does, without substantiation. (Compl. ¶¶ 28, 35(d), 35(e)(ii), 35(e)(iii).) Does have

17   nothing to do with this alleged activity. (Doe Decl. *passim*.) Because this conduct is irrelevant to

18   TEI's infringement claims, its inclusion in the Complaint suggests an alternative motive for bringing

19   the Action.

20        Ethan's conduct also reveals the Action's pretextual nature. On the day TEI filed, Ethan

21   admitted that the release of *Nuke* was a deliberate "trap" intended to lure streamers into reacting to

22   his work, stating: "the trap was set and it worked even better than I imagined." (approx. 3:51–4:24);

23   "The Snark subreddit has been a frequent and persistent infringer… that's how I knew when this

24   video came out the Snarkers were going to encourage, promote and push streamers…" (5:17–5:26).

25   (Vulić Decl. Ex. 20; *see also* Doe Decl. ¶63.2.) Ethan has repeatedly stated his intent to pursue legal

26   action to discover Does' identities, but for reasons other than alleged copyright infringement. (Doe

27   Decl. ¶¶72.1, 72.2, 94.2, 171, 186, 223; Vulić Decl. Ex. 21.)

28        Notably, TEI takes *no* issue with another streamer, "xQc," who, like Denims, reacted to

KRONENBERGER ROSENFELD

*Nuke*. *Unlike* Denims, xQc: 1) boasted 1.2 million Twitch followers (compared to Denims' 120,000 as of the date of this filing), 2) peaked at 94,000 live viewers (compared to Denims' 45,800), 3) reacted to *Nuke* for 48 minutes, 30 seconds (compared to Denims' over two hours of reaction time). (Doe Decl. ¶27.) The difference? xQc's reaction was *supportive* of Ethan. *See id*. The takeaway: Ethan does not find "group streaming sessions" infringing, unless they are critical of him.

Ethan is also known for legally targeting those who disagree with him. For example, H3/TEI was involved in an IP lawsuit with TrillerTV (*Triller Fight Club II LLC v. TEI*, 2:21-cv-03942-JAK-KS, C.D. Cal.); Ethan thereafter allegedly defamed Triller's principal, Ryan Kavanaugh, accusing him of fraud. (Doe Decl. ¶¶84, 85.) This led to a years-long lawsuit, in which Ethan filed and lost an anti-SLAPP motion, which was affirmed on appeal, *Kavanaugh v. Klein*, 2025 WL 999183 (Cal. Ct. App. Apr. 3, 2025), *reh'g denied* (Apr. 23, 2025), *review denied* (July 9, 2025). (Doe Decl. ¶¶84, 84.1, 84.2, 84.3, 85, 85.1; Vulić Decl. Ex. 34.)

Ethan has admitted that the mere existence of "snark" communities in general, are what "led to" the creators being sued in these three lawsuits. (Doe Decl. ¶¶63.2, 197.6.)

**4.    Does face real harm and retaliation if unmasked; discourse will be silenced.**

If Does are unmasked, they will face nearly certain risks of retaliation, harassment, and doxing, as shown by H3's track record. Ethan has a long history of trying to "unmask" those who criticize him anonymously, even dedicating an episode of the H3 Podcast titled "Unmasking the Harassment Against Us" where he reviewed dozens of anonymous threads and imagined false conspiracies in which moderation teams all conspired together. (Doe Decl. ¶¶172, 197.3, 281.) Ethan has personally made the following threats against Does:

- *"Listen, guys, at this point you [r/h3snark mods] are totally fucked. … There's a subpoena that's going to come. You can't erase your data. **We're going to get your IP address and find your information.**"* (Doe Decl. ¶70.1; Vulić Decl. Ex. 21.)
- "*If there's any justice in the world **[the h3snark mods] will lose everything that they care about and I will be the one who makes them lose those things… through legal means. Through any legal means.**"* (Doe Decl. ¶¶73.1, 197.1; Vulić Decl. Ex. 21.)
- "***I will spend and go to any limit to legally and within the scope of the law is allowed, to annihilate you, for any cost,*** *because you people are evil, you people are disgusting fucking human beings.*" (Doe Decl. ¶¶71.1, 188; Vulić Decl. Ex. 21.)
- *"There is no limit that I will do, legally, **to destroy their lives proudly and happily.** I will do it and I will stand proud on their fucking proverbial grave - in terms of their career.*" (Doe Decl. ¶74.1; Vulić Decl. Ex. 21.)

1    Ethan has made clear that his motive is not to seek redress for alleged infringement, but to punish

2    and expose Does because he believes they are responsible for harassment against him; they are not,

3    and TEI's lawsuit is a pretext.

4         In addition to Ethan's own threats against Does, and his incitement of others' threats against

5    Does, Ethan has previously incited others to react against other people he has disputes with. (Doe

6    Decl. *passim*; Vulić Decl. Ex. 26, 34.) As a result of Ethan's direct and indirect threats against Does,

7    past instances of actual retaliation instigated by Ethan against H3 critics, and Ethan's history of

8    personally harassing or instigating harassment against those he disagrees with, Does have legitimate

9    fears of being unmasked. (Doe Decl. *passim*.) Specifically, Does fear potentially being attacked, or

10   worse, killed, over moderating a subreddit. These worries extend to all family and friends connected

11   to Does. Does fear their professional lives being ruined, potential sexual violence, extortion, fans

12   showing up to their home, and endless years of harassment due to Ethan's prolific lies surrounding

13   them. The target he has painted on the moderators would make it unsafe to live openly in any

14   capacity. (*Id.*) Some of Does also have heightened risk of retaliatory harm due to their religious

15   identities. If their real names are revealed, these Does—and their families—face a real risk of being

16   doxed, stalked, or harassed, as has happened to others in similar situations. In this climate,

17   unmasking Does would expose them to significant and unjustified danger.

18        Further, unmasking Does poses a significant risk of chilling lawful speech on matters of

19   public concern, such as discussion and criticism of polarizing public figures, like Ethan and Piker,

20   and debate about current and historical political events, such as those discussed in *Nuke*.

21        In contrast, TEI cannot show damage from Does' conduct. Indeed, streamer reactions to *Nuke*

22   helped to boost viewership, which Ethan admits. (Doe Decl. ¶¶30, 51; Vulić Decl. Ex. 28.) Ethan in

23   fact invited the harm he complains of, by encouraging others to watch and react to *Nuke*. (Doe Decl.

24   ¶17.1; Vulić Decl. Ex. 26.)

25        As such, while TEI has not and cannot state a claim for contributory infringement, even if

26   this Court finds it has, private and public factors require the Court quashing the Subpoenas.

27                                            **ARGUMENT**

28   **I.    Legal Standard**

**A.    Quashing a Subpoena Generally**

Generally, parties may obtain discovery regarding any nonprivileged matter that is relevant to a claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). But where discovery encroaches on protected First Amendment speech, a party must show that discovery sought is highly relevant to claims or defenses—a more demanding standard of relevance than the Federal Rules. *See Perry v. Schwarzenegger*, 591 F.3d 1126, 1141 (9th Cir. 2009). Where a party seeks to unmask an anonymous speaker, they must meet a heightened standard. *See, e.g., In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022). Further, a court may quash a subpoena if it requires disclosure of privileged or other protected matter, such as First Amendment or otherwise protected speech, or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv).

Does have standing to move to quash because they have personal rights and privileges with respect to the documents requested in the subpoena, i.e., their identities. *See Glass Egg Digital Media v. Gameloft, Inc.*, No. 17CV04165MMCRMI, 2019 WL 2499710, at *5 (N.D. Cal. June 17, 2019) (collecting cases). This Motion is properly brought in this District because Reddit and Discord reside here, and it is the District in which compliance is required. Fed. R. Civ. P. 45(c)(2)(A), (d)(3).

**B.    Standard for Unmasking Anonymous Speaker**

The First Amendment protects a person's right to speak anonymously on the Internet, promoting the robust exchange of ideas and allowing individuals to express themselves freely without fear of economic or official retaliation or concern about social ostracism. *In re Gliner*, 133 F.4th 927, 933 (9th Cir. 2025). Thus, when a party seeks discovery to unmask an anonymous speaker, the test the court uses depends on the nature of the conduct alleged, viewed in *context* of the speech, the only relevant way to view communications. *See Highfields* at 975.

The degree of scrutiny required varies depending on the circumstances and the type of speech at issue. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1173, 1177 (9th Cir. 2011). Political speech is afforded the highest level of protection. *See id.* at 1173. The balancing of a plaintiff's right to seek redress for alleged harms against the right to speak anonymously is the touchstone. People who have committed no wrong should be able to participate online without fear that someone who

1  wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the
2  court's order to discover their identity. *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578
3  (N.D. Cal. 1999) ("*Seescandy*").

### 1.    Motion to Dismiss Analysis (*Seescandy*)

5  The lowest bar is the motion to dismiss or good faith standard. *See In re Anonymous Online*
6  *Speakers*, 661 F.3d at 1175. The plaintiff must: 1) identify the missing party with specificity to show
7  the defendant is a real person who could be sued in federal court; 2) identify all previous steps taken
8  to locate the defendant; 3) establish to the Court's satisfaction that the lawsuit could withstand a
9  motion to dismiss; and 4) file a request for discovery with the Court, with reasons justifying the
10  specific discovery requested, identifying a limited number of persons on whom discovery would be
11  served and for which there is a reasonable likelihood that discovery will lead to identifying
12  information making service of process possible.[10] *See Seescandy* at 578-80.

### 2.    Real Evidentiary Basis (*Highfields*)

14  *Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005) ("*Highfields*"),
15  established the "real evidentiary basis" standard, a two-part test for unmasking anonymous speakers.
16  Because an unmasking subpoena will always invade at least in some measure important rights that
17  are fundamental and fragile, Courts have a special duty to protect against unjustified invasion. *See*
18  *id.* at 975. First, the plaintiff must persuade the court there is a real evidentiary basis the defendant
19  engaged in wrongful conduct causing real harm to plaintiff's interests that the *laws plaintiff invoked*
20  were intended to protect. *Id.* at 975. (emphasis added.) Plaintiff may not simply plead and pray;
21  allegation and speculation are insufficient. *Id.* This high evidentiary bar is necessary because Rule 8
22  and 12(b)(6) standards offer too little protection to a defendant's competing interests. *See id.* Thus,
23  the plaintiff must adduce *competent evidence*, addressing *all* of the inferences of fact plaintiff must
24  prove to prevail on at least one cause of actions plaintiff asserts. *Id.* (emphasis in original). A
25  subpoena may not be enforced if any *essential* fact or finding lacks requisite evidentiary support. *Id.*

26

---

27  [10] Since TEI failed to file a motion seeking permission for early discovery, instead stipulating for
this relief with Denims, TEI has not yet raised the standard for seeking early discovery which the
court must consider, and accordingly, the Central District judge did not make the findings required
28  to unmask an anonymous speaker.

at 976.

Second, *only* if the plaintiff makes a sufficient evidentiary showing, the court assesses and compares the magnitude of the harms that would be caused to plaintiff's and defendant's competing interests by a ruling in favor of either side. *See id.* If enforcing the subpoena would cause *relatively little harm* to a defendant's First Amendment and privacy rights, and issuance is necessary to enable plaintiff to protect against or remedy *serious wrongs*, the court would deny the motion to quash. *Id.* (emphasis added).

This Court has found the *Highfields* test necessary in copyright infringement cases where the defendant's speech is political, religious, or literary, or the claims are based on critical, anonymous commentary. *See Art of Living Found. v. Does 1-10*, 2011 WL 5444622, at **5-6 (N.D. Cal. Nov. 9, 2011) ("*AoL*"); *see also Baugher v. GoDaddy.com LLC*, 2021 WL 4942658, at *3 (D. Ariz. Oct. 22, 2021). The focus is the "nature" of defendant's speech, *not* the cause of action alleged by the plaintiff. *See AoL* at *5 (emphasis added). Where online speech raises at least some constitutional protections, the *Highfields* test is used. *See Baugher*, 2021 WL 4942658, at *3 (where the nature of the speech is public criticism, even if not explicitly political or religious, and disclosure of an anonymous speaker's identity could have a chilling effect on such public criticism, then at least some First Amendment concerns are at stake).[11]

### 3.    The *Highfields* test applies here.

Here, Does acted in furtherance of their First Amendment right to speak anonymously on the Internet. *Nuke* and *Countdown* are controversial, politically charged pieces, sparking commentary, and criticism; indeed, the purpose of H3Snark and the Megathreads was to provide a *safe* space for commentary about H3. (Doe Decl. *passim*.) In posting the Megathreads, Does centralized and fostered discussions about and criticisms of the works. Unmasking Does for facilitating these conversations would have a chilling effect on public criticisms of the works and H3 generally. *See*

---

[11] Another test, borrowing from both *Seescandy* and other authority, and applied sometimes in anonymous copyright infringement cases, requires a concrete showing of a prima facie claim, specificity of the discovery request, absence of alternative means to obtain the requested information, a central need for the subpoenaed information to advance the claim, considered against the party's expectation of privacy. *See Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565 (S.D.N.Y. 2004). This is a somewhat lower bar than *Highfields*, but incorporates a balancing of the interests.

*Baugher*, 2021 WL 4942658, at *3. Thus, the court must go beyond the pleadings to find whether an evidentiary basis exists for the requested discovery; TEI cannot rely solely on the complaint's allegations. *See In re PGS Home Co. Ltd.*, 2019 WL 6311407, at *5 (N.D. Cal. Nov. 25, 2019); *Kechara House Buddhist Ass'n Malaysia v. Does*, 2015 WL 5538999, at *4 (N.D. Cal. Sept. 18, 2015).

## II.    TEI cannot meet is initial burden.

### A.    TEI has not stated—and cannot substantiate—a claim for contributory infringement.

Contributory copyright infringement is a form of secondary liability with roots in the tort-law concepts of enterprise liability and imputed intent. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) ("*Visa*"). In the Ninth Circuit, a defendant contributorily infringes if it (1) has knowledge of a third party's infringing activity, and (2) "induces, causes, or materially contributes to the infringing conduct." *Visa* at 795. In addition to establish contributory liability, a plaintiff must first establish direct infringement by third parties; secondary liability cannot exist in the absence of direct infringement by another. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); *Tarantino v. Gawker Media, LLC*, 2014 WL 2434647, at *3 (C.D. Cal. Apr. 22, 2014). An allegation that defendant merely provided the means to accomplish an infringing activity is insufficient. *See Tarantino* at *3.

#### 1.    TEI cannot show requisite knowledge for contributory infringement.

For contributory infringement liability to attach, a defendant must possess more than a generalized knowledge of the possibility of infringement. *See Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013); *Robinson v. Binello*, 771 F. Supp. 3d 1114, 1125 (N.D. Cal. 2025) (to be generally aware of copyright-related risks is not enough); *BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*, 644 F. Supp. 3d 602, 609 (C.D. Cal. 2022). Rather, the plaintiff must put forth evidence that the defendant had *specific* knowledge of *specific* infringing content, and then failed to take simple measures to prevent further damage. *See Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1115 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in part*, 2023 WL 4704891 (9th Cir. July 24, 2023); *Perfect 10, Inc. v. Giganews, Inc.*, 2015 WL 1746406, at **4-5 (C.D. Cal.

KRONENBERGER ROSENFELD

Mar. 6, 2015).

Simply facilitating infringement, without knowledge of direct infringement by third parties, will not result in secondary liability. *See Columbia Pictures v. Bunnell*, 2006 WL 5383789, at *4 (C.D. Cal. May 10, 2006). Moreover, mere conclusory allegations that a defendant had the required knowledge of infringement are plainly insufficient. *See YZ Prods., Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 763 (N.D. Cal. 2021), citing *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013). In determining whether a plaintiff has set forth a "real evidentiary basis" for knowledge, "entirely speculative" evidence does not satisfy the test. *See Awtry v. Glassdoor, Inc.*, 2016 WL 1275566, at *14 (N.D. Cal. Apr. 1, 2016).

The pertinent question here is whether Does had knowledge that Denims' use was infringing, as opposed to fair. TEI's allegations of knowledge fall far short. The Megathreads clearly state that Does understood that Denims would be *reacting to Nuke* and *Countdown, i.e.*, engaging in commentary and criticism. TEI alleges, based on nothing more than speculation, that Does were "well aware of Denims' reputation for copyright infringement and lazy reaction videos." (Compl. ¶45.) Even taking TEI at its word, which the Court cannot do, knowledge of a "reputation" for lazy reaction videos is simply not specific knowledge that Denims actually infringed *Nuke* and *Countdown* on her Jan. 31 stream—and, Does knew nothing of the sort. (Doe Decl. ¶20.)

TEI has not alleged, and cannot show, that Does watched Denims' stream such that they could know whether it was infringing, and not fair use; indeed, Does did not watch Denims' stream. (*Id.* ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.) All TEI alleges is that Does "knew it was ***highly likely***" Denims' reaction "***would be***" an infringing "group viewing session" and not a fair use, *i.e.*, generalized knowledge of *potential* that Denims' stream *might* infringe. Indeed, every single allegation about Does' knowledge *assumes* Does will *guess* Denims' future acts. This is not enough.

Does' evidence, compared to TEI's unsubstantiated allegations, shows the opposite of knowledge. Does did not view Denims' stream while it was live. (*Id.* ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.) Even if Does had watched Denims' stream, TEI has not shown that Does recognized Denims' use as infringing, and not fair use. Indeed, TEI ***did not notify Does*** that it considered Denims' use to be infringing. (Doe Decl. ¶31.) TEI did not send Does a demand to remove the links.

TEI did not notify Does indirectly, through a DMCA takedown notice. Because Does had no way of knowing, and did not in fact know, of specific infringement, the knowledge requirement is not satisfied. The analysis should stop here. *See YZ Prods.* at 763; *Luvdarts*, 710 F.3d at 1073 n. 2.

### 2. TEI cannot show that Does induced, caused, or materially contributed to any direct infringement.

The next question is whether creating a discussion thread, which includes a link to a streamer's channel, where the streamer reacts to a live broadcast while providing her own commentary and criticism, and users visiting the thread engage in their own debate about the live broadcast and reactions thereto, constitutes contributory infringement. It does not.

Liability for contributory copyright infringement requires proof that a defendant induces, causes, or materially contributes to the infringing conduct. *Visa* at 795. A defendant may infringe contributorily by intentionally inducing or encouraging direct infringement through specific acts or through use of a product or device. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("*Grokster*"). Inducement liability requires evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use. *See Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 878 (N.D. Cal. 2023). Material contribution to infringement requires substantial assistance to the *infringing activity*. *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011). (emphasis added).

If a plaintiff alleges a defendant induced by provision of a service,[12] the defendant must have promoted the service's use with the *object* of infringing copyright." *Visa* at 801, citing *Grokster* at 937. Mere knowledge of infringing potential or actual infringing use is not enough to subject a defendant to liability. *See id.* Moreover, it is crucial for a plaintiff to establish that defendants communicated an inducing message to their users. *See id.* The "improper object" of infringement "must be plain and must be affirmatively communicated through words or actions." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019), citing *Fung*, 710 F.3d at 1034. Only where a

---

[12] The inducement copyright doctrine applies to services available on the Internet as well as to devices or products. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013).

service is "good for nothing else" but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe, will an activity give rise to inducement liability. *See Grokster* at 932-33.

TEI alleges that Does promoted Denims as a substitute to watching *Nuke*, and created and pinned the Megathreads, in coordination with Denims, to direct users to Denims' "group viewing session." (Compl. ¶¶43-45.) These allegations are conclusory, unsubstantiated, and contradicted by the Complaint Exhibits and evidence.

Here, Does created the Megathreads to centralize and facilitate discussion about the works and reactions thereto. (Doe Decl. ¶¶6, 122-124.) The links in the Megathreads directed users to creators' homepages, not to any specific video or stream. (*Id*. ¶¶34, 35, 40, 130.) The Megathreads were "pinned" in a routine moderation practice to make topic-specific threads accessible and visible for the users of the Subreddit. (*Id*. ¶123.) The text of the Megathreads made clear that their purpose was for discussion about streamers' reaction and commentary, which is what happened. (Compl. Exs. G-I.) Indeed, Does' expectation was that Denims would create a fair use of the works. (Doe Decl. ¶¶20, 34, 42, 254.) One of the Megathreads linked directly to *H3's own broadcast* of *Nuke*, debunking TEI's theory that the purpose was to divert traffic *away* from it. (Doe Decl. ¶¶38.) Does did not provide the server space, *i.e.*, site and facilities, for Denims' alleged infringement, *see Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996); Does' Megathreads were not an "essential step" in the infringement process. The Megathreads were not "good for nothing else but" "encouraging" or "assisting" Denims' alleged infringement. And, Denims would have reacted to *Countdown* and *Nuke* whether the Megathreads existed or not, erasing any theory of material contribution.

TEI cannot show any coordination between Does and Denims, or any other streamer, whatsoever—and there was none. (Doe Decl. ¶¶21, 128-129.) TEI appears to attempt to show inducement through its allegations about instructions on "clipping" content[13] and use and encouragement of YewTube. (Compl. ¶¶30-33.) But this happened months before Denims' stream,

---

[13] The "instruction" for "clipping" content also included an instruction that users not infringe on copyright when clipping, which TEI omits.

KRONENBERGER ROSENFELD

1    and thus are not relevant to Denims' stream. Further, H3Snark mods disallowed use of these products

2    and services on the Subreddit in an explicit decision to ban alternative viewing sites. (Doe Decl. ¶¶

3    61, 117, 118, 119, 214.) Thus, TEI has not established that Does induced, caused, or materially

4    contributed to any infringement.

5              **3.    Does' Megathreads were fair use.**

6         Moreover, Does' Megathreads were a fair use under 17 U.S.C. §107 where Does referenced

7    the works for criticism and commentary and transformed the works, and where the Megathreads

8    themselves in no way replaced the originals. TEI's Subpoenas should be quashed for this additional

9    reason. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 884-886 (N.D. Cal. 2020).

10        **B.    Denims' use was fair use.**

11        There can be no contributory infringement without direct infringement. *See Perfect 10, Inc.*

12   *v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007). And if a use of a copyrighted work is fair,

13   it is not infringement at all. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016).

14   Because Denims' use of *Nuke* and *Countdown*, as a whole, was fair, there is no direct infringement

15   for which Does can be found contributorily liable.

16        The fair use doctrine permits and requires courts to avoid rigid application of the copyright

17   statute when it would stifle the very creativity which that law is designed to foster. *See Campbell v.*

18   *Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("*Campbell*"). Indeed, copyright's purpose is to

19   *promote* the creation and publication of free expression. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003)

20   (emphasis in original). The task is not to be simplified with bright-line rules; the statute, like the

21   doctrine it recognizes, calls for case-by-case analysis. *Campbell* at 577.

22        Courts explore and evaluate together, in light of the purposes of copyright, the following four

23   factors when considering whether the use of a work is "fair":

24        (1) the purpose and character of the use, including whether such use is of a commercial nature

25        or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the

26        amount and substantiality of the portion used in relation to the copyrighted work as a whole[14];

27        and (4) the effect of the use on the potential market for or value of the copyrighted work.

28

[14] The third factor weighs against a finding of fair use here.

17 U.S.C. §107; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013).

Ordinarily, the defendant bears the burden of proving fair use. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016). But "[t]o make a prima facie case of copyright infringement for the purposes of obtaining a subpoena, then, a party must make a prima facie case that the infringing use did not constitute fair use." *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 879 (N.D. Cal. 2022). TEI has not made such a showing here.

> **1.    Denims' use was transformative and does not supersede the original use.**

The first factor, "purpose and character," considers the reasons for, and nature of, the copier's use of an original work. *Warhol* at 528. The central question is whether the new work merely "supersedes" the objects of the original creation, supplanting it, or instead adds something new, with a further purpose or different character—whether the work is transformative. *Warhol* at 528; *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 3 (2021). Criticism, comment, and news reporting are precisely the sorts of copying that courts and Congress most commonly have found to be fair uses. *Warhol* at 528, citing 17 U.S.C. §107. This is because criticism of a work ordinarily does not supersede the objects of, or supplant it; rather, it uses the work to serve a distinct end. *Id.* The more transformative the new work, the less will be the significance of the other factors. *See Campbell* at 569.

In the typical "non-transformative" case, the use is one which makes no alteration to the expressive content or message of the original work. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013). In contrast, an allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent, even where the allegedly infringing work makes few physical changes to the original or fails to comment on the original. *See id.* Indeed, an expression of the author's apparent distaste for the original work fits squarely within fair use. *See In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 880 (N.D. Cal. 2022).

Here, Denims' use was transformative. Denims adds new content and a new purpose to *Nuke* and *Countdown*. Denims' stream commented upon and criticized *Countdown* and *Nuke*, directly responding to and highlighting controversial content of the works, not simply recounting what was shown. *See Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D. Cal. 2015); Compl. Ex. K. During her 10-hour-long stream, of which almost 5 hours addresses the works,

KRONENBERGER ROSENFELD

KRONENBERGER ROSENFELD

1    Denims repeatedly: pauses the films; comments on and critiques the works, Ethan, and his political

2    views; adds additional facts and context (referencing public and different sources); mocks the works;

3    and engages with her audience. *Id.* Further, *because* Denims reacted live, she was able to interact

4    with her audience and their immediate impressions and own critiques of the works. *Id.* That TEI

5    disagrees with or dislikes Denims' commentary and criticism is precisely what makes the use

6    transformative—Denims provides an alternative viewpoint, new content, and a new message. In

7    contrast, a reaction video that merely repeats and supports a work, without adding a new message—

8    like xQc's stream—would likely *not* be transformative.

9         It is true that the degree of transformation required to make "transformative" use of an

10   original must go beyond that to qualify as a derivative. *Warhol* at 529. But TEI would never

11   "transform" its own work into the character and purpose that Denims did—precisely because it is

12   *critical* of TEI and H3.

13        Finally, in analyzing the first factor, courts consider whether the work is commercial, but

14   that is usually of little significance, as most of the categories of examples of fair use in the preamble

15   to Section 107 are uses which are or could be commercial. Here, Denims did not seek to profit from

16   the inherent entertainment value of *Nuke*; her goal was to criticize it and offer her commentary.

17   Viewers who wanted to watch *Nuke* in its original form, would not have watched Denims' stream.

18        Because Denims' stream added new expressive content and a different message, this factor

19   weighs in favor of fair use.

20              **2.    TEI's highly factual works supports greater dissemination.**

21        This factor looks at the extent to which the copied work is creative and whether it is

22   unpublished. The law generally recognizes a greater need to disseminate factual works than works

23   of fiction or fantasy. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985).

24   Here, TEI's works were largely factual. Although they contained some creative elements, the vast

25   majority of the content comprised factual news and other creators' content. TEI's works were also

26   published, and TEI later broadcast *Nuke* on a 24/7 loop on Twitch. This weighs in favor of fair use.

27              **3.    Denims' use did not negatively impact the market; it increased it.**

28        The fourth factor, market effect, is the single most important element of fair use. *Monge v.*

*Maya Magazines, Inc.*, 688 F.3d 1164, 1180 (9th Cir. 2024). This factor asks whether consumers treat the challenged use as a market replacement for the original, or a market complement that does not impair demand for the original. *Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*, 753 F. Supp. 3d 933, 965 (C.D. Cal. 2024). Where the second use is transformative, market harm may not be so readily inferred. *See Campbell* at 591. The importance of the fourth factor will vary also with the relative strength of the showing on the other factors. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001). Effect on potential market requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original. *Campbell* at 590. The more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market. *See Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 941 (9th Cir.), *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002).

The court must also consider the source of the loss. A "lethal parody, like a scathing theatre review," may kill the demand for the original, but this kind of harm is not cognizable under the Copyright Act. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35 (2021), citing *Campbell* at 591-92. Finally, the court must take into account the public benefits the copying will likely produce. *See id.*

Here, there is little to no market effect on *Nuke*, because the viewers watching Denims' Stream, would not have watched TEI's *Nuke* anyway. Denims' reaction video scathingly criticized the works; it was not meant as, and was not, a replacement for the original. In fact, Ethan *encouraged* use of and reactions to his content. (Doe Decl. ¶¶51, 30.1.) H3 celebrated *other* streamers' reaction videos, like xQc's, which were *supportive* of *Nuke.* Arguably such reactions would have greater market harm on *Nuke*, belying TEI's allegations of harm from Denims' critical reaction. TEI offers no evidence that viewers who watch Denims' stream did so in replacement of watching *Nuke.* Further, widespread release of reaction videos criticizing a work would not, and do not, replace the original—a person wanting to view *Nuke* without critical commentary, will—and did—still watch the original.

Finally, TEI's own broadcasting of *Nuke* in a 24/7 loop starting on March 5, weighs against

23

1  a finding of market harm. (Vulić Decl. Ex. 47.) The first, second, and fourth factors weigh in favor
2  of fair use.

3          **4.      Stripping unoriginal elements, TEI's thin copyrights deserve little**
4                  **protection.**

5          Only the elements of a work that are protectable are compared to determine the ultimate
6  question of illicit copying. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th
7  Cir. 1994). Here, TEI's registrations excluded preexisting footage, preexisting photos, and
8  preexisting music; indeed, these are not protectable. But *Nuke* was comprised almost entirely of
9  preexisting footage, much of it unauthorized derivative works of Piker's own content. (Doe Decl.
10 ¶¶136-143.) *See Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1238 (C.D. Cal. 2003).
11 Subtracting these unoriginal elements, TEI is left with only a "thin" copyright, protecting against
12 only virtually identical copying. *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir.
13 2003). The thinness of TEI's copyrights, extending only to the original aspects of the works, weighs
14 in favor of fair use.

15 **III.     Even if TEI had met its initial burden, the balance of harms weighs in favor of Does.**

16         Because the nature of Does' speech sounds in the First Amendment—centralization of
17 discussion to critique a public figure and discuss matters of public interest and political concern—
18 this Court must balance the equities at issue, considering the context of the use. *See In re DMCA §*
19 *512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 8810 (N.D. Cal. 2022); *Awtry v. Glassdoor*,
20 Inc., No. 16-MC-80028-JCS, 2016 WL 1275566, at *15 (N.D. Cal. Apr. 1, 2016).

21         The balancing test requires the court to compare the magnitude of the harms that would be
22 caused to plaintiff's and defendants' competing interests by ordering defendants' identities to be
23 disclosed. *See Music Grp. Macao Com. Offshore Ltd. v. Does*, 82 F. Supp. 3d 979, 986 (N.D. Cal.
24 2015). The specific circumstances surrounding the speech serve to give context to the balancing
25 exercise. *See AoL* at *5 (quoting *Anonymous Online Speakers* at 1177). Only if disclosing
26 defendant's identity would cause relatively little harm to the defendant's First Amendment and
27 privacy rights, but be necessary to enable to protect against or remedy serious wrongs the law
28 invoked was designed to protect, should the court allow disclosure. *Highfields* at 976. Furthermore,

KRONENBERGER ROSENFELD

1   the court must ask whether disclosure of a defendant's identity would deter other critics from

2   exercising *their* First Amendment rights. *AoL* at *7-8. Clearly, enforcing a subpoena in this setting

3   poses a real threat, chilling protected comment on matters of interest to the public. *Highfields* at 980.

4       Here, the personal harms to Does by allowing unmasking, as well as the public harms to

5   online speech and discourse generally, would be irreparable in the private sense and long-reaching

6   in the public sense. (Doe Decl. *passim*.)

7       Persons in the place of Does—moderators of a public platform, the purpose of which is to

8   comment on and critique a public figure and political matters of public concern—have real First

9   Amendment interests in communicating anonymously. But if the court allows TEI's Subpoenas, it

10  would enable TEI to impose a considerable price on Does' use of the vehicle of anonymous speech—

11  including public exposure, real risks of retaliation and actual harm, and the financial and other

12  burdens of defending the Action. *Highfields* at 980-81. Very few would-be commentators are

13  prepared to bear costs of this magnitude. *Id.* So, when word gets out that the price tag of criticizing

14  Ethan is *this high*—that speech will disappear. *See id.* But *that*, is precisely what Ethan Klein wants.

15  **IV.    If Does' motion is not granted, Does request a protective order.**

16      A court may limit and specify conditions on production, including to protect a party from

17  embarrassment, oppression, or undue burden. *See* Fed. R. Civ. P. 45(d)(C); 26(c). The Ninth Circuit

18  allows parties to preserve their anonymity in the "unusual case" where nondisclosure of the party's

19  identity is necessary to protect them from harassment, injury, ridicule, or personal embarrassment.

20  *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000).

21      If Does' motion is denied or denied in part, Does request a protective order allowing

22  disclosure of Does' identities *only* to the Court, for the reasons stated, *supra*, Statement of Facts,

23  Sections B, D.4. *See Signature Mgmt. Team, LLC v. Automattic, Inc.*, 941 F. Supp. 2d 1145, 1158-

24  59 (N.D. Cal. 2013).

25  **V.    Does reserve their right to seek their attorney's fees.**

26      Does reserve their right to seek their attorney's fees and costs. TEI brought its suit against

27  Does for an improper purpose, and TEI's claims are obviously insufficient under the law. *See*

28  *Highfields Cap. Mgmt., L.P. v. Doe*, 2005 WL 8188026, at *6-8 (N.D. Cal. May 31, 2005).

1    Respectfully Submitted,

2    DATED: September 22, 2025              **KRONENBERGER ROSENFELD, LLP**

3

4                                          By:    s/ Leah Rosa Vulić
                                                  Leah Rosa Vulić
5
                                           Attorneys for Movants/Defendants Does
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28