1   ROM BAR-NISSIM (SBN: 293356)
    Rom@HeahBarNissim.com
2   **HEAH BAR-NISSIM LLP**
    1801 Century Park East, Suite 2400
3   Los Angeles, CA 90067
    Telephone: 310.432.2836
4
5   Attorneys for Respondent/Plaintiff
    TED ENTERTAINMENT, INC.
6
7
8               **UNITED STATES DISTRICT COURT**
9
                **NORTHERN DISTRICT OF CALIFORNIA**
10
11
    IN RE. SUBPOENAS TO REDDIT, INC.   | Case No.: 3:25-mc-80296-SK
12  AND DISCORD, INC.
                                        | (Case No. 2:25-cv-05564-WLH-PD, Pending in
13                                       Central District of California)
14
                                        **TED ENTERTAINMENT, INC.'S**
15                                      **OPPOSITION TO THE DOE**
                                        **DEFENDANTS' MOTION TO QUASH**
16                                      **PLAINTIFF'S SUBPOENAS TO REDDIT,**
                                        **INC. AND DISCORD, INC.**
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I. INTRODUCTION: NO ONE LIKES A CRYBULLY...................................................................1

II. STATEMENT OF FACTS...........................................................................................................2

    A.    TEI and its Owners – Ethan and Hila Klein .................................................2

    B.    H3Snark ...........................................................................................................3

    C.    The Creation, Dissemination and Infringement of The Nuke ........................6

III. LEGAL STANDARD...............................................................................................................8

IV. TEI'S *PRIMA FACIE* CASE OF CONTRIBUTORY COPYRIGHT
INFRINGEMENT AGAINST THE H3SNARK MODS ...........................................8

    A.    Denims Engaged in Direct Infringement ......................................................9

    B.    The H3Snark Mods Fail to Demonstrate Fair Use ........................................9

        1.    The H3Snark Mods Fail to Show They Made a Fair Use.....................10

        2.    The H3Snark Mods Fail to Show Denims Made a Fair Use ................10

    C.    The H3Snark Mods Knew of Denims' Infringement.....................................19

    D.    The H3Snark Mods Induced Denims' Infringement .....................................22

V.    THE BALANCING TEST FAVORS DISCLOSURE .................................................23

VI.    A PROTECTIVE ORDER IS UNWARRANTED.......................................................25

VII.    CONCLUSION.............................................................................................................26

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agdal v. X Corp. In Int. to Twitter*,
2025 WL 81594 (N.D. Cal. Jan. 13, 2025) ........................................................................ 8, 23

*Amazon Content Services LLC v. DeBarr*,
-- F.Supp.3d --, 2025 WL 2217715 (C.D. Cal. Aug. 4, 2025) ...................................... 8

*Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ............................................................................. 10, 11, 12, 17

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ................................................................................. 19

*Atari Interactive, Inc. v. Redbubble, Inc.*,
515 F.Supp.3d 1089 (N.D. Cal. 2021) ...................................................................... 9

*Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*,
742 F.Supp.2d 1101 (C.D. Cal. 2010) ...................................................................... 19

*Bartz v. Anthropic PBC*,
787 F.Supp.3d 1007 (N.D. Cal. 2025) ...................................................................... 18

*Baugher*,
2021 WL 4942658 .................................................................................... 8, 9, 10, 23

*Cognosphere Pte. Ltd. v. X Corp.*,
2024 WL 4227594 (N.D. Cal. Sept. 18, 2024) ................................................... 8, 23, 24

*De Fontbrune v. Wofsy*,
39 F.4th 1214 (9th Cir. 2022) ........................................................................... 10, 11

*Doe 1 v. GitHub*,
672 F.Supp.3d 837 (N.D. Cal. 2023) ....................................................................... 25

*Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*,
596 F.3d 1036 (9th Cir. 2010) ............................................................................... 25

*Does 1 Thru XXIII v. Advanced Textile Corp.*,

    214 F.3d 1058 (9th Cir. 2000) ........................................................................... 25

*Elvis Presley Enterprises, Inc. v. Passport Video*,

    349 F.3d 622 (9th Cir. 2003) .................................................................... 11, 17

*Erickson Prods., Inc. v Kast*,

    921 F.3d 822 (9th Cir. 2019) ............................................................................ 19

*Furie v. Infowars, LLC*,

    401 F.Supp.3d 952 (C.D. Cal. 2019) ................................................................ 20

*Hachette Book Grp, Inc. v. Internet Archive*,

    115 F.4th 163 (2d Cir. 2024) ...................................................................... 17, 18

*Harper & Row Pub., Inc. v. Nation Enters.*,

    471 U.S. 536 (1985).......................................................................................... 17

*Hosseinzadeh v. Klein*,

    246 F.Supp.2d (S.D.N.Y. 2017) ....................................................... 3, 10, 12, 17, 21

*In re DMCA Subpoena to Reddit, Inc.*,

    441 F.Supp.3d 875 (N.D. Cal. 2020)......................................................... 8, 9, 23

*In re DMCA § 512(h) Subpoena to Twitter*,

    608 F.Supp.3d 868 (N.D. Cal. 2022)................................................................. 8

*In re Reddit*,

    2024 WL 477519 (N.D. Cal. Feb. 7, 2024) .................................................... 23

*Lenz v. Uni. Music Corp.*,

    815 F.3d 1145 (9th Cir. 2016) ...................................................................... 9, 21

*Luvdarts, LLC v. AT&T Mobility, LLC*,

    710 F.3d 1068 (9th Cir. 2013) .......................................................................... 21

*McGucken v. Ocean Pub. Ltd.*,

    42 F.4th 1149 (9th Cir. 2022) ..................................................................... 16, 18

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

    545 U.S. 913 (2005).......................................................................................... 22

*Mishiyev v. UMG Recordings, Inc.*,

   2025 WL 2625525 (M.D. Fla. Sept. 11, 2025) ............................................................. 21

*Monge v. Maya Magazines, Inc.*,

   688 F.3d 1164 (9th Cir. 2012) ........................................................................... 11, 16

*Nat. Fire Protection Assoc., Inc. v. UpCodes, Inc.*,

   753 F.Supp.3d 933 (C.D. Cal. 2024) ............................................................... 18

*Penguin Random House LLC v. Colting*,

   270 F.Supp.3d 736 (S.D.N.Y. 2017) ............................................................... 11

*Shaffer v. Kavarnos*,

   2025 WL 2299173 (S.D.N.Y. Aug. 7, 2025) ............................................................. 21

*VHT, Inc. v. Zillow Group, Inc.*,

   918 F.3d 723 (9th Cir. 2019) ........................................................................... 17

**<u>Statutes</u>**

17 U.S.C. Section 512(f) ........................................................................... 21

17 U.S.C. § 106 ........................................................................................... 9

17 U.S.C. § 107 ........................................................................................... 9

**<u>Rules</u>**

Federal Rules of Evidence 602, 802, 805, 901, 1002-1003 ............................................. 2

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

Plaintiff/Respondent Ted Entertainment, Inc. ("TEI") respectfully submits its Opposition to the Motion to Quash (Dkt. No. 1) ("Motion") of Movants/Defendants Does (collectively, the "H3Snark Mods").

## I.   **INTRODUCTION: NO ONE LIKES A CRYBULLY**

Piracy as criticism is not a thing. This case is about piracy. It is not about stifling criticism. To the contrary, this case is about the ***lack of sufficient criticism*** to justify promoting a watch party showing copyrighted works – in their entirety – at the exact moment they were released to the public for express purpose of commercial gain.

TEI is the copyright owner of: (1) *The H3 Show # 104: Countdown to Doomsday* ("Countdown Episode"); and (2) *Content Nuke: Hasan Piker* ("*The Nuke*"). Defendant Alexandra Marwa Saber p/k/a Denims ("Denims") hosted an online watch party (the "Watch Party") of the Countdown Episode and *The Nuke* (collectively, the "Works").

Denims' Watch Party broadcast: (1) the Countdown Episode concurrently with its live broadcast and nearly in its entirety; and (2) *The Nuke* immediately after its public release and in its entirety. Her statements and lack of critical commentary demonstrate that Denims' objective was to commercialize her Watch Party and have it serve as a substitute for the Works.

The H3Snark Mods are contributorily liable for Denims' infringement of the Works. The H3Snark Mods had actual knowledge that Denims was broadcasting the Works without permission from TEI. This is evidenced by ***three*** pinned community posts on the r/H3Snark subreddit the day before and during Denims' infringement to promote her Watch Party. Further, by not watching Denims' Watch Party prior to promoting it, the H3Snark Mods could not have formed any opinion on whether she made a fair use of the Works. Rather, all they knew was that Denims was showing the Works without authorization. Despite this, the H3Snark Mods still promoted her Watch Party.

TEI subpoenaed Reddit, Inc. and Discord, Inc. for personal identifying information about the H3Snark Mods. This is TEI's only option to identify the H3Snark Mods and hold them accountable for contributing to Denims' infringement of the Works. Obtaining the H3Snark Mods identities is essential to naming them in the lawsuit and serving them with the Complaint.

The H3Snark Mods treat this Court like their subreddit. They use their Motion and

1  supporting declarations as subterfuge to traffic in falsehoods and gross misrepresentations about

2  the owners of TEI, Ethan Klein ("Ethan") and Hila Klein ("Hila") (collectively, the "Kleins").[1]

3  The H3Snarks call these falsehoods "criticism." When the Kleins respond to this "criticism," the

4  H3Snark Mods claim the Kleins are engaging in "harassment," "abuse" and "threats." Not only

5  does this fail to demonstrate the Kleins' are averse to and seek to silence criticism, it shows the

6  Kleins are willing to directly confront it. Rather, the opposite is true: it is the H3Snark Mods that

7  reveal they are unable to handle the Kleins responding to and exposing their "criticism" as

8  falsehoods and gross misrepresentations.

9  TEI and the Kleins have gone to great lengths to accommodate the H3Snark Mods'

10  concerns. They informed the H3Snark Mods that they will: (1) not publicly disclose their personal

11  identifying information; (2) not publicly address or refer to the H3Snark Mods in their individual

12  capacities; (3) instruct their audience not to contact, harass or harm the H3Snark Mods in any

13  manner; and (4) narrow the scope of the subpoenas. The H3Snark Mods' omission of these

14  concessions is intentional because it counters their narrative, which they ask this Court to adopt.

15  The H3Snark Mods, however, are not the Kleins' victims. They are their victimizers.[2]

16  Therefore, for the reasons set forth in this opposition, TEI respectfully requests that this

17  Court deny the Motion in its entirety.

## II.  STATEMENT OF FACTS

### A.  TEI and its Owners – Ethan and Hila Klein

20  TEI is a production company that produces online content, primarily for YouTube. It

21  owns the YouTube channels "h3h3Productions" and "H3Podcast." JKD, ¶ 8. TEI is best known

22  for producing The H3 Show f/k/a The H3 Podcast – which is publicly released on the H3 Podcast

23  YouTube channel. *Id.* At the time the events relevant to this dispute occurred, TEI released four

---

[1] The H3Snark Mods frequently cite Reddit posts and other materials authored by third parties to support their claims. TEI objects to each of these as hearsay and lacking personal knowledge, foundation and proper authentication. Insofar as clips are part of those posts, TEI objects under the best evidence rule as well. Federal Rules of Evidence 602, 802, 805, 901, 1002-1003.

[2] TEI will refrain from addressing the H3Snark Mods' outlandish claims in this brief. Instead, it will focus on the material facts and law to this case. TEI and its owners apologize for needing to address the H3Snark Mods claims in their joint declaration and attorney declaration. *See* Joint Declaration of Ethan Klein and Hila Klein ("JKD"), ¶¶ 25 (fn. 18), 35-97; Declaration of Rom Bar-Nissim ("RBN Decl."), ¶¶ 3-40, 56, 79-80. The Kleins' greatest concern is that the Court takes the H3Snark Mods assertions at face value and signs off on their counterfactual narrative.

live broadcasts of The H3 Show a week (three public and one for paying members). *Id.* The h3h3Productions channel contains scripted and highly edited commentary videos. *Id.*, ¶¶ 8-9. Both forms of content provide comedic commentary on current events and public figures. *Id.*

TEI is owned by the Kleins. JKD, ¶ 7. The Kleins pioneered fair use reaction videos on YouTube and established legal precedent on the issue in *Hosseinzadeh v. Klein*, 246 F.Supp.2d 34 (S.D.N.Y. 2017). JKD, ¶ 10. The Kleins co-host The H3 Show and collaborate together on videos for the h3h3Productions channel. *Id.*, ¶¶, 7, 9.

The Kleins are high-profile Jewish Israeli-Americans. JKD, ¶ 11. Hila was born in Israel, while Ethan emigrated to Israel for a period of time and became a citizen. *Id.* For years, the Kleins have consistently spoken out against Israel's occupation of the Palestinian territories and the atrocities committed by the Israeli government against the Palestinian people. *Id.*, ¶¶ 18-19.

Prior to October 7, 2023, Ethan hosted a political comedy podcast with the prominent leftist streamer, Hasan Piker ("Hasan"). JKD, ¶ 22. After October 7th, friction grew between Hasan and the Kleins. *Id.* While the Kleins publicly stated Israel was committing a genocide in Gaza and condemned how Israel was conducting the war, the Kleins still advocated for a two-state solution and condemned political violence and terrorism. *Id.* In contrast, Hasan justified political violence and terrorism and advocated for the immediate dismantling of the State of Israel. *Id.* The public disagreement between the Kleins and Hasan led to supporters of Hasan and his perspective to attack the Kleins as genocide supporters and participants. *Id.*

**B.    H3Snark**

Snark subreddits are a relatively new genre of message boards on Reddit. JKD, ¶ 20. They are comprised of "fallen fans" of a particular creator. *Id.*, ¶ 21. They have a notorious reputation for cyberbullying, spreading falsehoods and engaging in invasive and obsessive behavior. *Id.*, ¶ 20. One subreddit was even implicated in the suicide of an online content creator by her widow. *Id.*

Snark subreddits are also hubs of copyright infringement. RBN Decl., ¶ 13; JKD, ¶ 21. They satiate the ravenous appetite of fallen fans to "hate watch" the content by providing unauthorized alternatives to the original – describing it as "ethical viewing." JKD, ¶ 21.

r/H3Snark is a snark subreddit that targets the Kleins and TEI content. JKD, ¶ 23. While

H3Snark was established before October 7th, its user base grew tremendously after the public schism between Hasan and the Kleins following October 7th. *Id.* H3Snark became the central location to attack the Kleins and falsely brand them as advocating the genocide of Palestinians. *Id.*, ¶¶ 23, 38-40.

H3Snark also became a hub for copyright infringement of TEI content. RBN Decl., ¶¶ 7-19, Exs. 49-56. Despite the fallen fans' hatred of the Kleins, they religiously hate watched TEI's content. *Id.* The H3Snark Mods were keenly aware of the appetite of H3Snark users for TEI content. *Id.* Additionally, they were aware that the users wanted to consume TEI content through unauthorized means to avoid supporting TEI and the Kleins (*i.e.*, providing views to TEI content, which would increase the content's visibility and advertising revenue). *Id.*

The H3Snark Mods enthusiastically supplied their users with market substitutes for TEI content. Initially, the H3Snark Mods would provide links to TEI content that was located – not on TEI's authorized YouTube channels – but on YewTube. RBN Decl., ¶¶ 9-14, Exs. 49-53. As one H3Snark Mod stated: "***We encourage folks to watch on <u>yewtube</u> since it doesn't play ads or contribute to their view counts***". *Id.*, ¶ 12, Exs. 50, 53. The H3Snark Mods disseminated these links on megathread posts pinned to the top of the H3Snark page. *Id.* The H3Snark Mods also spammed YewTube links of TEI content during live chats hosted by the H3Snark Mods on H3Snark. *Id.*, ¶¶ 9-10, Exs. 50-51. Once the broadcast was complete, the H3Snark Mods would delete the live chat to destroy the evidence of their contributory infringement. *Id.*, ¶ 11.

The H3Snark Mods provided instructions to its users on how to download TEI content (specifically paywalled content) for reupload onto H3Snark. RBN Decl., ¶ 8, Ex. 49. On the "tools-tips-guides" page of H3Snark's wiki page, the H3Snark Mods provided instructions on how to download "Members-Only" content for reposting onto H3Snark. *Id.* H3Snark users followed these instructions and uploaded entire episodes of paywalled content onto H3Snark. *Id.*, ¶ 7.

On August 1, 2024, TEI reached a breaking point regarding the infringement of TEI's content on H3Snark. RBN Decl., ¶ 7. On that date, TEI discovered that its paywalled video, *H3 Podcast BTS #53* (which was 23:24 minutes) was uploaded in its entirety onto H3Snark. *Id.* The title of the post did not contain a critical aspect or solicit criticism. *Id.* Rather, it merely described

4

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

the contents of the video: "H3 Live Show Behind the Scenes." *Id.* The post had two short comments that had no critical bearing on the style or substance of the video. *Id.*

At that point, TEI decided to issue DMCA takedowns for H3Snark posts that met very specific and exacting criteria. RBN Decl., ¶¶ 3-19. First, TEI would only target posts containing TEI content that had a non-critical, descriptive title and did not solicit criticism. *Id.*, ¶ 4 Second, TEI would only target posts where: (1) the H3Snark Mods locked the post, which made it impossible for anyone to comment or critique the content; and/or (2) lacked comments with any critical bearing on the content at the time of the DMCA takedown. *Id.* If the title or comments of the post had even marginal critical bearing on the style or substance of the clip, TEI refrained from issuing a DMCA takedown. *Id.* This exacting standard was established for the express purpose of staying well clear of silencing any criticism. *Id.*, ¶ 5.

From August 1, 2024 to November 26, 2024, TEI issued six DMCA takedowns of H3Snark posts and one for a comment containing a YewTube link. RBN Decl., ¶¶ 3-19, Exs. 49-56. Each of the posts or the comment subject to TEI's DMCA takedowns met the aforementioned criteria. *Id.* A thorough fair use analysis was provided with each DMCA Takedown to explain TEI's good faith belief why the post or comment did not qualify as fair use. *Id.*

H3Snark retaliated against the DMCA takedowns. They made pinned community posts and megathreads attacking the DMCA takedowns, along with the Kleins and TEI's counsel as abusing the DMCA takedown system. RBN Decl., ¶¶ 20-21. H3Snark began soliciting individuals to file counternotifications. *Id.*, ¶ 23. TEI received two counternotifications for the seven takedowns it issued. *Id.*, ¶¶ 23-29. The first counternotification was clearly fraudulent and issued by the H3Snark Mods. *Id.*, ¶ 24-26. Reddit ultimately recognized it was fraudulent and refused to honor the first counternotification. *Id.*, ¶ 27, Ex. 59. The second counternotification complied with the statutory requirements for a counternotification – which Reddit honored as required by law. *Id.*, ¶ 28. However, the statement justifying the second counterclaim demonstrated the issuer failed to consider the fair use factors as required by law. *Id.*, ¶¶ 29-30, Ex. 60.

The H3Snark Mods' claim that H3Snark was intended as a "safe space" for "good faith criticism" of the Kleins warrants closer scrutiny. The "criticism" most frequently levied against the

Kleins in H3Snark was that they advocated the genocide of Palestinians and supporting Israel's actions in Gaza. JKD, ¶¶ 38-41, Ex. 70.

The declarations of the H3Snark Mods are replete with assertions that contain material omissions, gross misrepresentations and outlandish and false conspiracy theories. JKD, ¶¶ 35-97. While the Kleins do their utmost to address these assertions, some of the most absurd claims are worth highlighting. One of the claims is that the Kleins sent human skulls to themselves to elicit sympathy after being investigated based on a fraudulent report to the Los Angeles County Department of Child and Family Services. *Id.*, ¶ 77. Another claim is the Kleins are using the subpoenas as a fishing expedition because Ethan wore a "fishing" hat when discussing the subpoenas. *Id.*, ¶ 72. Yet another claim is that Ethan intends to kill them based on quoting the film *Taken*. *Id.*, ¶ 73.

The H3Snark Mods claim that the Kleins intend to publicly retaliate against them also warrants closer scrutiny. While the H3Snark Mods feel they are entitled to make false and outlandish claims against the Kleins as a form of "criticism" (no matter how horrific or abusive), they consider the Kleins' public statements defending themselves against these allegations and criticizing the H3Snark Mods as a form of abuse and harassment. This double standard epitomizes the H3Snark Mods abuse and harassment of the Kleins: they seek protection for their "criticism," but seek to punish the Kleins for exercising their First Amendment right to refute this "criticism."

**C.**     **The Creation, Dissemination and Infringement of *The Nuke***

Beginning in mid October 2024, the Kleins reached a breaking point. JKD, ¶ 24. They kept witnessing how Hasan radicalized people to – not be pro-Palestinian – but pro-terrorism. *Id.* They were fed up with how H3Snark was repeatedly branding them as genocide supporters. *Id.* As such, the Kleins – through TEI – decided to create a documentary that exposed how Hasan radicalizes individuals online to support terrorism against Jews and Israelis. *Id.*

*The Nuke* was created over the course of several months. JKD, ¶ 25. It utilized a combination of comedy, commentary, archival materials, audio and visual effects, montage and editing to lampoon and criticize Hasan and the platform that enables him, Twitch. *Id.*, Exs. E, 69. The duration of *The Nuke* is of a feature length film, totaling over one hour and forty-two

minutes. *Id.*, ¶ 25, Ex. E.

The Kleins (particularly Ethan) promoted the video frequently before its release on January 31, 2025. JKD, ¶ 28. The public interest in the video – including on H3Snark – was immense. *Id. The Nuke* was originally set to release on January 30, 2025. *Id.*, ¶ 29. On that date, the H3Snark Mod u/jewettornesarah made a pinned community post on H3Snark to maximize its visibility (the "1/30/25 Post"). RBN Decl., ¶ 35; Dkt. No. 7, p. 103.

The 1/30/25 Post was entitled "MEGATHREAD | Content Nuke – **Where to Watch** & Discussion." Dkt. No. 7, p. 103 (emphasis added). The 1/30/25 Post provided links to various creators, including Denims, as a place "***to watch the nuke <u>without showing support for H3</u>***" (*i.e.*, TEI). *Id.* (emphasis added). The 1/30/25 Post stated they were providing links to creators, like Denims, because they "supported" H3Snark "by engaging directly with" the H3Snark Mods. *Id.*

On January 31, 2025, TEI broadcast the Countdown Episode at around 12:24 p.m. PST on the H3 Podcast YouTube channel. JKD, ¶ 30. It was intended to drum up interest for the release of *The Nuke* and cover various topics and current events. *Id.* At 1:30 p.m. when the Countdown Episode completed, TEI released *The Nuke* on the h3h3Productions YouTube channel. *Id.*

During the broadcast of the Countdown Episode, the H3Snark Mod u/h3snarkmodteam made a pinned community post on H3Snark to maximize its visibility (the "First 1/31/25 Post). RBN Decl., ¶ 38; Dkt. No. 7, p. 133. The title for the post was "DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in about an hour." *Id.* It contained a hyperlinked picture of Denims that took users directly to her homepage where people could view her Watch Party of the Countdown Episode. *Id.*; RBN Decl., ¶¶ 38, 40, Ex. 62.

Shortly after *The Nuke* was released, the H3Snark Mod u/h3snarkmodteam created another pinned community post on H3Snark to maximize its visibility (the "Second 1/31/25 Post"). RBN Decl., ¶ 39; Dkt. No. 7, p. 116. It contained text featuring Denims as a place "to watch reactions to this video." *Id.* Next to her name was the word "**<u>Link</u>**" written in bold and underlined that took users directly to Denims' homepage where they could view her Watch Party of *The* Nuke. *Id.*; RBN Decl., ¶¶ 39-40, Ex. 62. The H3Snark Mods also provided links to other creators, but Denims was at the top of the list. Dkt. No. 7, p. 116. The list included information on

1   whether they were currently streaming *The Nuke* or would be doing so shortly. *Id.*

## III.   <u>LEGAL STANDARD</u>

Currently, there is a split in authority regarding the standard to disclose a doe defendant's identity via subpoena when "the anonymous speech at issue constitutes copyright infringement or relates to illegal activity[.]" *Agdal v. X Corp. In Int. to Twitter*, 2025 WL 81594, \*4 (N.D. Cal. Jan. 13, 2025). "[S]ome courts have concluded that that a First Amendment analysis can be dispensed with altogether while others have concluded that consideration of the First Amendment concerns is still appropriate." *Id.* (collecting authorities).

Some courts have adopted the following test: (1) "the party seeking the disclosure must demonstrate a *prima facie* case on the merits of its underlying, in this case, copyright claim;" and (2) "the Court balances the need for the discovery against the First Amendment interest at stake." *Cognosphere Pte. Ltd. v. X Corp.*, 2024 WL 4227594, \*3 (N.D. Cal. Sept. 18, 2024); *Baugher v. GoDaddy.com LLC*, 2021 4942658, \*3 (D. Ariz. Oct. 22, 2021) (same); *In re DMCA § 512(h) Subpoena to Twitter*, 608 F.Supp.3d 868, 876 (N.D. Cal. 2022) (same).

As this Court is well-aware, another court has rejected the balancing of the equities part of the inquiry because "it is not well suited for a copyright dispute" since "the First Amendment does not protect anonymous speech that infringes copyright." *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 882 (N.D. Cal. 2020). Rather, First Amendment considerations are adequately addressed examining "fair use in the context" of "whether there was a prima facie case of copyright infringement." *Id.* at 883. Irrespective of which test applies, the Motion must be denied.

## IV.   TEI'S *PRIMA FACIE* CASE OF CONTRIBUTORY COPYRIGHT INFRINGEMENT AGAINST THE H3SNARK MODS

The *prima facie* showing requires a plaintiff to "produce competent evidence supporting a finding of each fact that is essential to a given cause of action." *Baugher*, 2021 WL 4942658, \*3. The elements of contributory copyright infringement are: "(1) direct infringement by a third party; (2) that the defendant knew or had reason to know of the third party's infringing activity; and (3) the defendant induced, caused or materially contributed to the infringing conduct." *Amazon Content Services LLC v. DeBarr*, -- F.Supp.3d --, 2025 WL 2217715, \*4 (C.D. Cal. Aug. 4, 2025).

8

## A. Denims Engaged in Direct Infringement

The elements of direct copyright infringement are: "(1) ownership of a valid copyright and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright infringement." *Baugher*, 2021 WL 4942658, *3.

"Copyright registration establishes a prima facie case of ownership." *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F.Supp.3d 1089, 1111 (N.D. Cal. 2021). TEI registered the Works with the United States Copyright Office. The registration number for: (1) the Countdown Episode is PAu 4-257-253; and (2) *The Nuke* is PAu 4-256-429. JKD, ¶¶ 26, 34; RBN Decl., ¶¶ 34, 37; Exs. 5-6.

On January 31, 2025, Denims hosted her Watch Party of the Works. RBN Decl., ¶ 41. TEI never authorized Denims' use of the Works in any manner. JKD, ¶ 31. As such, her Watch Party violated TEI's right to publicly perform, reproduce and create derivatives of the Works. *See* 17 U.S.C. § 106(1-2 & 4). As such, TEI has proven of underlying direct infringement.

## B. The H3Snark Mods Fail to Demonstrate Fair Use

The Ninth Circuit makes "clear that the burden of proving fair use is always on the putative infringer." *Lenz v. Uni. Music Corp.*, 815 F.3d 1145, 1152-53 (9th Cir. 2016). This applies with equal force in the context of subpoenas seeking to identify anonymous individuals for copyright infringement. *See Baugher*, 2021 WL 4942658, *4 (quoting *Lenz*); *cf. In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d at 883 (holding the movant/defendant must "establish[] he made fair use of the copyrighted works" to quash the subpoena).

Fair use is codified in Section 107 of the Copyright Act. The statute sets forth four non-exclusive factors courts consider to evaluate fair use:

1. [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. [T]he nature of the copyrighted work;
3. [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4. [T]he effect of the use upon the potential market for or value of the copyrighted work

17 U.S.C. § 107.

**1.**     <u>The H3Snark Mods Fail to Show They Made a Fair Use</u>

The H3Snark Mods incorrectly argue that they made a fair use of the Works by facilitating commentary and criticism of them by users of H3Snark. Dkt. No. 1, pp. 15:6-16:14, 28:5-9. The Ninth Circuit has rejected this argument: the "end-user's utilization of the product is largely irrelevant" to fair use. *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1224 (9th Cir. 2022). This has been applied with equal force in motions to quash seeking to unmask anonymous copyright infringers:

> Posting a work and implicitly inviting comment or criticism is the same as simply copying the work; any work made public will always inspire an opinion in the reader, but the reader's implicit opinion is not the same as comment or criticism formed and made by the blogger who copies the copyright-protected work.

*Baugher*, 2021 WL 4942658, *4.

These cases are in accord with the Supreme Court's mandate that fair use must examine "the specific 'use' of the copyrighted work" at issue. *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith* ("*Warhol*") 598 U.S. 508, 533 (2023). The H3Snark Mods did not provide any commentary of the Works in the First 1/31/25 Post or Second 1/31/25 Post (collectively, the "1/31/25 Posts"). Dkt. No. 7, pp. 116, 133. Whether ***third-parties*** commented on the Works in the 1/31/25 Posts is irrelevant because the issue here is the ***H3Snark Mods*** use – not third parties.[3]

Therefore, the H3Snark Mods' argument fails as a matter of law.

**2.**     <u>The H3Snark Mods Fail to Show Denims Made a Fair Use</u>

**a.**     <u>The First Factor Weighs Heavily Against Fair Use</u>

The first fair use factor "relates to the problem of substitution" – *i.e.*, whether the new work "supersedes" or "supplant[s]" the original. *Warhol*, 598 U.S. at 527. The "central question" is whether the secondary work "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a secondary use has "some further purpose" or "add[s] something new … does ***not*** render such uses fair." *Id.* at 528-529 (emphasis added). Rather, "whether an allegedly infringing use has a further purpose or different character" is "a ***matter of degree***, and the degree of difference ***must*** be weighed against other considerations, like

---

[3] The H3Snark Mods claim that the "text of the Megathreads made clear that their purpose was for discussion about streamers' reaction and commentary" fails to withstand scrutiny. Dkt. No. 1, p. 27:12-13. Neither the title or contents of the 1/31/25 Posts referenced "discussion" or "commentary" whatsoever. Dkt. No. 7, pp. 116, 133. Further, as the Court in *Hosseinzadeh* makes clear, not all reaction videos are equal fair use. 276 F.Supp.3d at 40 fn. 1.

commercialism." *Id.* at 532 (emphasis added). When "the purposes of the works ***overlap***" or the secondary use does "not serve an '***entirely different function***' than the originals," the first fair use factor does not favor fair use. *De Fontbrune*, 39 F.4th at 1225 (emphasis added).

The "first factor also relates to the justification for the use" both in the "broad" and "narrower sense." *Warhol*, 598 U.S. at 531-532. In the "broad sense," a use is justified if it has a "distinct purpose" that "furthers the goal of copyright … without diminishing the incentive to create." *Id.* at 531. A use is justified in the "narrower sense" when it "is reasonably necessary to achieve the user's new purpose." *Id.* Such justification is "particularly relevant to assessing fair use" where "wide dissemination of a secondary work would otherwise run ***the risk of substitution for the original*** or licensed derivatives." *Id.* (emphasis added). Again, "the question of justification is one of degree." *Id.*

When examining criticism, "each quoted passage" must serve "a different purpose (an object of criticism)." *Warhol*, 598 U.S. at 528 fn. 4. Consequently, "a court must consider each use within the whole to determine whether the copying is fair." *Id.* The first fair use factor does ***not*** favor fair use when "***a defendant copies more than is necessary to facilitate 'comment or criticism*.'**" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 751 (S.D.N.Y. 2017) (emphasis added). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression ***must be in service of commentary on that work***. It is not enough for part of a work to have a transformative purpose." *Id.* (emphasis added).

When "clips are played without much interruption, if any" or "used in excess of [the] benign purpose," the use is "not consistently transformative." *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 628-629 (9th Cir. 2003). Additionally, "wholesale copying sprinkled with [spoken] commentary" fails to transform a work. *Id.*; *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1174, 1176 (9th Cir. 2012) (same). Further, when "the commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes according (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Warhol*, 598 U.S. at 530-531.

The degree to which a secondary use has a different purpose or character "must be

weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525. "The undisputed commercial character of [the defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Id.* at 537. The first factor "does not" favor "any user who wants to reach different buyers, in different markets, consuming different products." *Id.* at 548 fn. 22.

*Hosseinzadeh* provides useful guidance because it expressly addresses the issue of fair use in the context of reaction videos. As the court noted, reaction videos "vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material." *Hosseinzadeh,* 276 F.Supp.3d at 40 fn. 1. Reaction videos that "intersperse **short segments** of another's work with criticism and commentary" are considered a fair use. *Id.* (emphasis added) When a reaction video is more "akin to a group viewing session," it is not considered fair use. *Id.* at 40, 45-47 (providing analysis of all four fair use factors).

The primary purpose of Denims' Watch Party was to provide a substitute for the Works and exploit them for commercial gain, as explained below.

**Countdown Episode**: Denims streamed almost the entirety of the Countdown Episode concurrently with TEI's original broadcast. RBN Decl., ¶¶ 43-44; Ex. K at 9:30-1:15:26. Consequently, people viewed Denims' Watch Party of the Countdown Episode instead of the original broadcast – as it would make little sense to view both. As Denims herself once recognized: "***If someone watches content on someone's else's stream, there is a very low likelihood that they're going to go watch it separately and give you the view or the like.***" RBN Decl., ¶¶ 49, 50(d), Ex. 64 at 36:00-36:13; *see also Id.* at 30:00-30:13 (similar statement).

The commercial purpose of Denims' Watch Party of the Countdown Episode is immediately evident. Denims commercially exploited the Countdown Episode by receiving paid subscriptions, donations and advertising revenue during her Watch Party of the Countdown Episode. RBN Decl., ¶ 44; Ex. K at 9:30-1:15:26. Further, Denims used the Countdown Episode to promote her Watch Party of *The Nuke* by: (1) placing a chyron at the top of her screen stating: "CONTENT NUKE DROPS AT 1:30 PM PST" (*id.* beginning at 0:34); (2) adding a countdown timer for when *The Nuke* would be publicly released (*id.* beginning at 16:48); and (3) encouraging people to view her Watch Party instead of *The Nuke* by stating: "***If you want to watch it, you***

***know, come enjoy the watch party somewhere else***." *Id.* at 23:40-47.

It is equally evident that any criticism of the Countdown Episode was an afterthought. Denims watched long sections of the Countdown Episode with little to no interruption for several minutes at a time.[4] She even let the Countdown Episode play for 2:21 minutes while she was off camera. Ex. K at 39:18-41:40. When she returned, Denims was silent for an additional minute. *Id.* at 41:41-42:41. When Denims did speak, she provided (in the aggregate) only: (1) 4:43 minutes of brief and superficial commentary with little to no critical bearing on the original;[5] (2) 43 seconds of partially related commentary that meanders into unrelated topics;[6] and (3) 2:12 minutes of unrelated or unintelligible comments.[7] During 1:03:56 hour runtime of Denims' Watch Party, she lets the Countdown Episode play uninterrupted for nearly 88% of the time. *Id.* at 9:30-1:15:26.

***The Nuke***: Denims started her Watch Party of *The Nuke* one-minute after its release to the public and showed *The Nuke* in its entirety. JKD, ¶ 30; RBN Decl., ¶ 45; Ex. K at 1:15:19. At its peak, Denims received approximately 45,000 concurrent viewers – the most concurrent viewers of Denims' entire career. RBN Decl., ¶ 46, Ex. 63. Denims' purpose was to commercially exploit *The Nuke* for personal gain. On 174 separate occasions, she received paid subscriptions, donations and advertising revenue during her Watch Party of *The Nuke*. RBN, Decl., ¶ 47; *see also* Ex. K at 1:15:19-5:06:20.

Denims made several statements that emphasized her primary purpose was to commercialize her Watch Party and offer it as a substitute for *The Nuke*.

- The title of her stream was: "ETHAN KLEIN HASAN CONTENT NUKE **WATCH PARTY** THIS IS NOT A DRILL." RBN Decl., ¶ 48, Ex. 62 (emphasis added).

---

[4] Ex. K at 9:30-12:09, 12:14-14:36, 14:55-16:25, 17:45-18:51, 19:06-20:25, 24:09-25:22, 23:40-26:40, 26:48-27:18, 27:25:30:22, 30:27-32:23, 33:41-35:59; 36:05-36:37, 37:22-38:16, 38:20-39:07, 42:53-44:36, 44:43-45:21, 45:24-46:06, 46:17-46:48, 46:52-48:04, 48:23-50:40, 50:45-51:49, 51:58-54:12, 54:19-54:43, 54:48-56:44, 57:02-58:42, 59:08-59:54, 1:00:01-1:01:45, 1:01:57-1:02:50, 1:03:16-1:04:04, 1:04:06-1:05:36, 1:07:47:1:09:05, 1:09:13-1:10:20, 1:11:39-1:13:05, 1:13:45-1:14:22, 1:14:35-1:15:18.
[5] *Id.* at 12:09-13, 14:37-54, 16:26-27, 17:02-16, 17:37-44, 32:24-33:40, 36:00-04, 37:19-21, 38:17-19, 42:42-52, 44:37-42, 45:22-23, 46:07-16, 46:49-51, 51:50-57, 54:13-18, 54:44-47, 56:45-57:01, 58:43-44, 58:52-59:07, 59:55-1:00:00, 1:01:46-56, 1:05:37-43, 1:05:55-1:06:47, 1:07:02-07, 1:07:44-46, 1:09:6-12, 1:10:21-28, 1:10:58-11:02, 1:11:31-38, 1:15:19-26.
[6] *Id.* at 18:52-19:05, 50:41-44, 1:02:51-1:03:15
[7] *Id.* at 20:20-23:39, 23:40-47, 24:02-08, 25:23-40, 26:41-47, 27:19-31, 30:23-26, 36:38-39, 48:05-22, 1:04:05, 1:07:20-22, 1:13:06-44, 1:14:23-24.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

- Prior to her Watch Party, Denims stated: "***If you want to watch it, you know, come enjoy the watch party somewhere else***." Ex. K at 23:40-47. Additionally, Denims read a message from her chat stating: "We're relying on you to stay live so ***we don't give more views to the Nuke***" – to which Denims replied: "Yeah, I'm going to. I'm going to stream it since he confirmed it's coming out today. We're going to stream it." Ex. J at 4:48:38-4:48:48.

- Prior to and throughout her Watch Party of *The Nuke*, Denims prominently displayed the chyron "***Watching*** Hasan Content Nuke From Ethan Klein." Ex. K beginning at 1:15:03.

- During her Watch Party, Denims responded to a chatter by stating: "Unfortunately, we are ***watching*** the Ethan Nuke." Ex. K at 2:06:09-23.

- Immediately after her watch party, Denims stated: "Well guys, if you enjoyed ***not giving any views to that terrible video***, follow, subscribe, throw a prime, if you like the content if you enjoyed your time here. … I appreciated you guys tuning in with me because, I'm going to be honest, I did not want to ***watch*** that by myself."[8] Ex. K at 5:07:45-5:08:09.

- The following day, Denims stated: "And I know all of those people ***didn't want to give the video another view***. Which is why they ***watched it with me***." RBN Decl., ¶ 48(f), Ex. L.

Denims' conduct during her Watch Party was fully consistent with her statements. Denims failed to address the majority of points raised in *The Nuke*. RBN Decl., ¶ 45. On ***74*** separate occasions, Denims plays *The Nuke* uninterrupted for 30 seconds or more (and frequently a minute or longer) – accounting for 70% of *The Nuke*.[9]

During the Watch Party, Denims admits she was not providing sufficient commentary

[8] A "prime" refers to a free paid subscription to a Twitch channel provided by Amazon Prime.
[9] Ex. K at 1:15:38-1:16:09, 1:16:56-1:19:10, 1:19:33-1:20:59, 1:21:41-1:22:11; 1:24:12-1:25:14, 1:25:43-1:27:28, 1:36:01-1:37:10, 1:37:44-1:38:15, 1:39:16-1:39:55, 1:41:47-1:43:05, 1:46:59-1:48:12, 1:48:18-1:49:15, 1:57:33-1:58:07, 1:58:51-2:00:37, 2:00:58-2:01:29, 2:01:56-2:02:45, 2:03:31-2:04:07, 2:06:24-2:07:24, 2:11:07-2:12:01, 2:12:26-2:13:04, 2:13:30-2:14:20, 2:16:19-2:17:08, 2:17:16-2:18:00, 2:18:15-2:19:40, 2:20:34-2:22:20, 2:29:01-2:31:19, 2:32:01-2:33:00, 2:33:32-2:35:10, 2:39:46-2:41:04, 2:42:04-2:43:53, 2:45:04-2:45:35, 2:45:47-2:47:04, 2:47:26-2:47:56, 2:48:04-2:49:50, 2:51:20-2:52:29, 2:57:25-2:58:13, 2:59:23-3:00:39, 3:04:52-3:05:36, 3:06:16-3:07:17, 3:10:42-3:11:21, 3:12:02-3:12:57, 3:16:59-3:17:46, 3:17:49-3:18:20, 3:24:15-3:25:32, 3:25:48-3:36:53, 3:28:23-3:29:49, 3:26:27-3:37:38, 3:40:15-3:40:55, 3:41:29-3:42:48, 3:44:41-3:45:33, 3:48:32-3:49:12, 3:51:04-3:43:45, 3:56:03-3:56:56, 3:59:16-3:59:50, 4:00:44-4:02:23, 4:12:58-4:13:32, 4:19:37-4:20:09, 4:21:51-4:22:36, 4:23:49-4:24:30, 4:25:57-4:26:30, 4:28:24-4:29:10, 4:36:07-4:36:47, 4:38:05-4:39:40, 4:39:47-4:40:25, 4:41:17-4:42:12, 4:43:11-4:44:23, 4:45:39-4:46:11, 4:46:49-4:47:32, 4:47:52-4:48:30, 4:52:41-4:53:41, 4:54:53-4:55:31, 5:00:50-5:01:36, 5:04:00-5:04:31, 5:05:24-5:06:20

because she did not want to pause *The Nuke* frequently. Ex. K at 3:00:53-3:01:36, 3:01:49-3:02:09.

When she does speak, Denims frequently makes short comments with no critical bearing on the style or substance of *The Nuke*, such as (1) incoherent and unclear utterances;[10] (2) speaking with her chat about unrelated or minimally related topics;[11] (3) discussing unrelated or minimally related topics;[12] (4) providing brief and superficial comments with little to no elaboration;[13] (5) frequently expressing confusion by a particular excerpt due to not prescreening *The Nuke*.[14]

In the rare instances where Denims does provide lengthier commentary, her comments have no critical bearing on the style or substance of *The* Nuke. Examples include: (1) discussing China's credit score system (Ex. K at 1.22:40-1:24:11), which was not discussed in *The Nuke* whatsoever; (2) after the discussion of Hasan's apologia for China's genocide of the Uyghurs, Denims attacks the United States as worse than China because of issues with disability benefits, incarceration levels and treatment of transgender individuals (*id.* at 1:25:43-1:35:51), which has nothing to do with *The Nuke*; and (3) after the critique of Morgan Kama Majed p/k/a Frogan ("Frogan"), Denims goes on a diatribe on why Frogan is more American than her (*id.* at 4:14:35-4:19:36), which has nothing to do with *The Nuke*.

To be certain, there are moments when Denims makes a highly transformative use of *The Nuke* (albeit infrequently and inconsistently). Where *The Nuke* seeks to expose how Hasan radicalizes individuals to hate Jews and Israel, Denims occasionally uses *The Nuke* to radicalize individuals to hate Jews and Israel. The inconsistent and infrequent nature of this transformation, however, fails to justify showing *The Nuke* in its entirety immediately upon release for an express commercial purpose by playing large portions of it uninterrupted or with minimal commentary.[15]

[10] *Id.* at 1:19:11-15, 1:21:00-07, 1:22:12-14, 2:12:02-04, 2:14:55-56, 2:37:05-14, 2:47:57-2:48:03, 3:24:35-3:24-14, 4:24:47-56, 4:31:01-18; 4:52:36-40.
[11] *Id.* at 3:19:42-3:20:19, 3:20:24-34, 3:23:35-3:24:14, 3:29:45-3:30:14, 3:37:46-50, 3:38:52-3:39:12, 3:43:41-55, 3:48:13-16, 3:50:15-30, 3:50:44-3:51:03, 4:02:32-35, 4:21:34-50, 4:22:37-52, 4:31:40-53, 4:34:14-44, 4:42:17-19.
[12] *Id.* at 1:37:37-43, 1:38:23-33, 1:58:48-50, 4:46:35-38, 2:06:05-08, 2:39:09-45, 2:45:36-46, 3:01:37-48, 4:20:10-32, 4:32:58-4:33:06, 4:35:39-4:36:06, 4:40:58-4:41:07
[13] *Id.* at 1:21:14-40, 5:04:58-5:05:23, 1:46:42-50, 2:03:28-30, 2:16:17-18, 2:17:09-15, 2:19:41-2:20:03, 2:41:05-07, 4:43:56-4:54:08, 3:46:23-37, 3:59:51-56, 4:30:29-30, 4:57:40-51
[14] *Id.* at 1:39:16-55, 1:41:47-1:43:22, 1:38:34-1:39:15, 1:46:59-1:48:17, 3:03:21-49, 3:40:15-3:41-28, 4:38:05-4:39:40.
[15] The H3Snark Mods' analysis of the first factor is intentionally vague, at a high level of abstraction and lacks a single timestamp. Dkt. No. 1, pp. 21:24-22:19. TEI's complaint went into (continued).

1    In sum, the first fair use factor weighs heavily against fair use.

2    **b.    The Second Factor Weighs Against Fair Use**

3    The second fair use factor (*i.e.*, "the nature of the copyrighted work") "typically has not

4    been terribly significant in the overall fair use balancing." *McGucken v. Ocean Pub. Ltd.*, 42 F.4th

5    1149, 1161 (9th Cir. 2022). It examines "the extent to which [the original work] is creative and

6    whether it is unpublished." *Id.* Even when a work "document[s] a real event," the work can still be

7    "creative because [it is] the product of many technical and artistic decisions." *Id.* Whether a work

8    is published asks whether the author exhausted the "right to control the first public appearance" of

9    the work. *Monge*, 688 F.3d at 1178. The mere fact a work is published "does not weigh in favor of

10   fair use." *McGucken*, 42 F.4th at 1162.

11   The fact the Works were published does not weigh in favor of fair use because Denims

12   streamed: (1) the Countdown Episode concurrently with its broadcast; and (2) *The Nuke* one

13   minute after its release. RBN Decl., ¶ 45; Ex. K at 1:15:19. Further, while containing numerous

14   documentary and factual elements, both Works contained numerous creative elements, which

15   weighs against fair use.[16] JKD, ¶ 25 & fn. 18, Ex. 69; *see generally* Ex. K.

16   Therefore, the second fair use factor weighs against fair use.

17   **c.    The Third Factor Weighs Heavily Against Fair Use**

18   The third fair use factor examines "the quantitative amount and qualitative value of the

19   original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162.

20   Consequently, the third fair use "factor circles back to the first factor because the extent of

21   permissible copying varies with the purpose and character of the use." *Id.*

22   When "the amount used is substantial with respect to the infringing work, it is evidence of

23   exacting detail why Denims failed to sufficiently transform *The Nuke* and provided timestamps
     and citations. *Compare* Dkt. No. 7, ¶ 2, Ex. 1, pp. 49:17-75:28 *with* Dkt. No. 1, pp. 21:24-22:19. It

24   is no accident why the H3Snark Mods fail to address the gravamen of TEI's argument. By
     acknowledging that the ***extent*** of Denims' commentary was insufficient to justify showing *The

25   Nuke* in its entirety immediately upon release, the H3Snark Mods would have to acknowledge that
     this case is not about silencing criticism, but a lack of it.

26   [16] The H3Snark Mods argue that, because *The Nuke* contains preexisting materials, it is only
     entitled to "thin" copyright protection under the second fair use factor. Dkt. No. 1, pp. 32:15-

27   33:14. This argument is specious and ignores the countless creative decisions – such as creation of
     original footage, performance, voice over, editing, graphics, comedy, juxtapositions, montages and

28   other creative elements that comprise *The Nuke*. JKD, ¶ 25 & fn. 18, Ex. 69.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

the value of the copyrighted work." *Elvis Presley*, 349 F.3d at 630. Indeed, "[c]opying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019). If, however, "the new user only copies as much as necessary for his or her intended use, this factor will not weigh against the new user." *Elvis Presley*, 349 F.3d at 630.

Once again, *Hosseinzadeh* is insightful. In the aggregate, the reaction video at issue used "three minutes and fifteen seconds of the five minute, twenty-four second long" original video – *i.e.*, approximately 60% of the original. *Hosseinzadeh*, 276 F.Supp.3d at 40. The reaction video, however, was "almost fourteen minutes long" and "intersperse[d] relatively ***short segments*** of the [original] video with ***long segments*** of ... commentary." *Id.* (emphasis added). Ultimately, the Court found that the third factor was "neutral" because, while the Kleins copied "a great deal" of the original, "the 'extent' and 'quality and importance' of the video clips used by [the Kleins] were … ***plainly necessary to the commentary and critique***." *Id.* at 46 (emphasis added).

Here, Denims streamed *The Nuke* in its entirety and the Countdown Episode nearly in its entirety. As discussed in Section V.B.2.a, Denims failed to provide commentary or criticism on significant portions (if not the majority) of both Works. Such use was clearly unnecessary and excessive of any potential criticism or commentary Denims provided on the Works themselves.[17]

### d. The Fourth Factor Weighs Heavily Against Fair Use

This factor is "undoubtedly the single most important element of fair use." *Harper & Row Pub., Inc. v. Nation Enters.,* 471 U.S. 536, 566 (1985). "While the first fair use factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn. 12.

The fourth factor is tied to the other factors. "The first and fourth factors are closely related, as the more copying is done to achieve a purpose that is the same or substantially similar to the original, the more likely it is that the copy will serve as a 'satisfactory substitute for the original.'" *Hachette Book Grp, Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024). Also, the "third and fourth factors are interrelated, as ***the greater the amount and substantiality of the***

---

[17] The H3Snark Mods concede the "third factor weighs against a find of fair use here." Dkt. No. 1, p. 28 fn. 14. No further explanation is provided. The reason is self-evident: it requires admitting that Denims failed to comment on the majority of points raised in both Works and, therefore, her "commentary" was not consistently transformative.

use, '*the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original*.'" *Id.* at 187-188 (emphasis added). Further, when "a case involves commercial use, such as here, 'the defendant must rebut that presumption of market effect.'" *Nat. Fire Protection Assoc., Inc. v. UpCodes, Inc.*, 753 F.Supp.3d 933, 965 (C.D. Cal. 2024).

The fourth factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm," "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the ***potential*** market for the copyrighted work." *Id.* (original emphasis).

At bottom, the fourth factor "asks whether consumers treat a challenged use 'as a market replacement' for the copyrighted work[.]" *Nat. Fire*, 753 F.Supp.3d at 965. The fourth fair use "factor points ***against fair use when a copyist makes copies available that displace demand for copies the copyright owner already makes available or readily could***." *Bartz v. Anthropic PBC*, 787 F.Supp.3d 1007, 1031 (N.D. Cal. 2025) (emphasis added).

Denims knew her Watch Party was a market substitute for the Works. She said so herself when reading messages from her chat. Examples include: (1) "***If you want to watch it, you know, come enjoy the watch party somewhere else***." (Ex. K at 23:40-47); (2) Denims read a message from her chat stating: "We're relying on you to stay live so ***we don't give more views to the Nuke***" – to which Denims replied: "Yeah, I'm going to. I'm going to stream it since he confirmed it's coming out today. We're going to stream it." (*id.*, at 4:48:38-4:48:48); (3) "Well guys, if you enjoyed ***not giving any views to that terrible video***, follow, subscribe, throw a prime, if you like the content if you enjoyed your time here. (*id.* at 5:07:45-5:08:09); and (4) The day after her Watch Party, Denims stated: "And I know all of those people ***didn't want to give the video another view***. Which is why they ***watched it with me***." Ex. L.

Further, Denims' Watch Party served as a market substitute for the originals is evidenced by the tens of thousands of individuals who watched her Watch Party before they had any

opportunity to watch the Works. RBN Decl., ¶ 46, Ex. 63; JKD, ¶¶ 30, 33. These individuals watched Denims' Watch Party instead of the Works because Denims streamed them concurrently or immediately after the public release of the Works. *Id.*, Ex. K at 9:30-1:15:26.

Denims knew her Watch Party (as a general matter) took views away from the original. In a debate with the creator Jay Exci in 2022, Denims admitted multiple times that her watch parties are substitutes for the original: "***If someone watches content on someone's else's stream, there is a very low likelihood that they're going to go watch it separately and give you the view or the like.***" RBN Decl., ¶¶ 49-50, Ex. 64 at 36:00-36:13. In that same discussion, she also admitted:

> There's no point of watching something a second time. You already watched it. Maybe, like,if you're watching it with some other people or something or it's been a long time, you might re-watch the video. ***But once you watch the video in one place, it's pretty unlikely you're going to go back and watch it again.***

RBN Decl., ¶ 50(d), Ex. 64 at 30:00-30:13.

TEI lost ad revenue for the Works as a result of Denims' Watch Party.[18] JKD, ¶ 33. As her viewers admitted, people watched Denims' Watch Party in lieu of the original Works. *Id.* Further, other individuals also hosted watch parties of *The Nuke* by showing it in its entirety immediately upon release with minimal commentary. RBN Decl., ¶¶ 52-54, Exs. 65-66; JKD, ¶ 33.

Therefore, all the fair use factors decisively weigh against fair use.

### C.     The H3Snark Mods Knew of Denims' Infringement

The knowledge requirement of contributory infringement requires either: (1) "actual knowledge of specific acts of infringement"; (2) "willful blindness of specific facts"; or (3) there is "reason to know" of specific acts of infringement. *Erickson Prods., Inc. v Kast*, 921 F.3d 822, 831 (9th Cir. 2019). "The standard for the knowledge requirement is objective[.]" *Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 742 F.Supp.2d 1101, 1118 (C.D. Cal. 2010); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (same).

Here, the H3Snark Mods knew that Denims was streaming both Works. The title of the First 1/31/25 Post was "DENIMS is LIVE reacting now to today's H3 podcast episode and the

---

[18] YouTube videos are monetized through ad revenue received from views. JKD, ¶ 32.The greatest demand for a YouTube video is immediately and shortly after its release. *Id.* Further, the views and search results a video receives, the more it is promoted through YouTube's algorithm – which further increases the number of views and advertising revenue. *Id.*

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

'content nuke' video Ethan is publishing in about an hour" – *i.e.* Denims was ***currently*** streaming

the Countdown Episode and would stream *The Nuke* upon its release. Dkt. No. 7, p. 136.

The Second 1/31/25 Post was titled "Ethan Klein's Content Nuke on Hasan Piker | H3

Snark Megathread" with the text "Places to watch reactions to this video:" Dkt. No. 7, p. 113. The

Second 1/31/25 Post contained a list of creators and whether they were streaming *The Nuke* (*e.g.*,

"*(LIVE NOW),*" "*(GOING LIVE SOON)*," "*(Live but not reacting yet)*" or "(not reacting yet)"). *Id.*

(original emphasis). For Denims, the Second 1/31/25 Post stated: "**Denims (Twitch) | <u>Link</u>** *(LIVE*

*NOW)*" – *i.e.*, Denims was ***currently*** streaming *The Nuke*. *Id.* (original emphasis). Therefore, the

H3Snark Mods knew that Denims was exploiting the Works when they made the 1/31/25 Posts.[19]

The H3Snark Mods do not testify that Denims had a license to use the Works. Indeed,

proving the existence of a license was their burden as well.[20] *Furie v. Infowars*, *LLC* 401

F.Supp.3d 952, 968 (C.D. Cal. 2019) ("The existence of an implied license is an affirmative

defense to a claim of copyright infringement and the burden of proof is ultimately on the party

seeking to avoid infringement liability.").

To the contrary, the 1/30/25 Post proves the H3Snark Mods knew (or had reason to know)

that Denims and other creators did not seek permission from TEI to exploit the Works by stating:

(1) they were providing links "to watch the nuke ***without showing support for H3***" – *i.e.*, TEI

would not receive any benefit because the use was unauthorized; and (2) they were promoting

creators who "supported" H3Snark "by engaging directly" with the H3Snark Mods – *i.e.*, creators

who would stream the Works without seeking permission from TEI. Dkt. No. 7, p. 103. This

proves the only thing the H3Snark Mods knew for certain was Denims' use of the Works was

[19] The H3Snark Mods assert the Second 1/31/25 Post linked directly to *The Nuke*. Dkt. No. 1, p.
27:15-16 (citing Dkt. No. 8, ¶ 38). The hyperlink was hidden in the letter "i" in the word "this" in
the phrase "Places to watch reactions to this video." *Id.* In contrast, the links to other creators –
including Denims who was at the top of the list – were displayed prominently with the word
"**<u>Link</u>**" in bold and underlined that directed users to their respective streams. Dkt. No. 7, pp. 116.
The claim that the hyperlink being confined to the letter "i" was an accident strains credulity. This
was no accident; it was intentional to provide the imprimatur linking to the original when the
Second 1/31/25 Post was clearly intended to direct viewers to Denims' Watch Party. Also, the
First 1/31/25 Post did not have a link to the Countdown Episode whatsoever. Dkt. No. 7, p. 133.
[20] The H3Snark Mods claim that Ethan stated TEI was "opening our IP to the world" as to
"clips." Dkt. No. 8, ¶¶ 51-53, 59 (citing fn. 43). Here, Denims did not use clips but *The Nuke* in
its entirety and the Countdown Episode nearly in its entirety. Therefore, this statement is
inapplicable. Further, it is meritless argument to claim TEI has either abandoned their copyrights
or granted a license to them. RBN Decl., ¶¶ 32-33.

unauthorized – *i.e.*, knowledge of infringement.

The H3Snark Mods' arguments against knowledge fail to withstand scrutiny. First, they argue the posts stated that "Denims would be *reacting to the Nuke* and *Countdown*, *i.e.*, engaging in commentary and criticism." This argument fails as a matter of law because *Hosseinzadeh* expressly stated not all reaction videos are fair use. 246 F.Supp.3d at 40 fn.1.

Second, the H3Snark Mods argue that they did not know about Denims' infringement because they "did not view Denims' stream while it was live." Dkt. No. 1, p. 25:24-26. This is a fatal admission. To begin, this argument goes to the H3Snark Mods' purported ***subjective*** belief – which is irrelevant because knowledge is an ***objective*** inquiry. Regardless, the H3Snark Mods could not – as a matter of law – form any opinion about whether Denims made a fair use without reviewing and analyzing her Watch Party in its entirety before making that determination. *See Lenz*, 815 F.3d at 1154-55; *Mishiyev v. UMG Recordings, Inc.*, 2025 WL 2625525, *3 (M.D. Fla. Sept. 11, 2025); *Shaffer v. Kavarnos*, 2025 WL 2299173, *2 & fn. 2 (S.D.N.Y. Aug. 7, 2025).[21]

Rather, the H3Snark Mods pay "lip service to the consideration of fair use by claiming [they] formed a good faith belief when there is evidence to the contrary." *Lenz*, 815 F.3d at 1154. They promoted Denims' unauthorized use of the Works without first determining whether she made a fair use. This is also the epitome of willful blindness. It proves the H3Snark Mods: (1) "subjectively believed infringement was likely occurring"; and "(2) took deliberate actions to avoid learning about the infringement." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013).[22]

Therefore, TEI has met its burden to demonstrate the H3Snark Mods had knowledge of Denims' infringement of the Works.

[21] The cited cases hold that, prior to issuing a DMCA takedown or counternotification, the issuer must form a subjective good faith belief regarding fair use. They further state that, to form a good faith belief on fair use, the issuer must watch the material in its entirety and conduct a fair use analysis ***before*** issuing the takedown or counternotification. This is why TEI did not issue a DMCA Takedown for 1/31/25 Posts; it would have risked exposure for claim for DMCA misrepresentation under 17 U.S.C. Section 512(f) by issuing them prematurely. RBN Decl., ¶ 51.
[22] The H3Snark Mods argument would also lead to perverse results. It incentivizes defendants to either: (1) claim they believed someone would make a fair use; or (2) purposefully avoid examining a particular use of a copyrighted work before promoting the unauthorized use. This would create a "get out of liability free card" for anyone accused of contributory infringement.

## D. The H3Snark Mods Induced Denims' Infringement

The Supreme Court held that inducement of copyright infringement includes: (1) "advertising an infringing use"; (2) "active steps taken to encourage direct infringement"; and/or (3) "actively and knowingly aid[ing] and abet[ing] another's direct infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster*"), 545 U.S. 913, 936 (2005).

Here, the H3Snark Mods advertised, encouraged and actively and knowingly aided and abetted Denims' infringing use of the Works by directing viewers to her Watch Party through the 1/31/25 Posts. Dkt. No. 7, pp. 116 & 133. The links in both posts took viewers directly to Denims' homepage where they could view her Watch Party.[23] *Id.* Denims even admitted that the H3Snark Mods were responsible for "signal boosting" her Watch Party, which increased the views. Ex. L.

Further, the H3Snark Mods "aim[ed] to satisfy a known source of demand for copyright infringement." – *i.e.*, intent to achieve an unlawful objective. *Grokster*, 545 U.S. at 939. The 1/30/25 Post demonstrates the H3Snark Mods intent to satisfy their users' desire for unauthorized versions of the Works. In the post, the H3Snark Mods stated: "***Hey everyone, we've seen a lot of comments about <u>wanting to watch the nuke without showing support for H3</u>***" – *i.e.*, recognizing their users wanted to consume unauthorized versions of *The Nuke*. Dkt. No. 7, p. 107 (emphasis added). The post provided links to individuals who "supported" H3Snark "by engaging with [the H3Snark Mods] directly or citing [H3Snark] posts in their own critiques of H3" – *i.e.*, individuals who would stream the Works without seeking permission from TEI. *Id.* Further, the H3Snark Mods provided links for their users so they could "***watch along***" with Denims and other creators – *i.e.*, an infringing watch party. *Id* (emphasis added).

This is reinforced by the H3Snark Mods' prior history of providing infringing YewTube links to deprive TEI of advertising revenue. The H3Snark Mods knew H3Snark users wanted unauthorized versions of TEI content, even stating they "***encourage[d] folks to watch on yewtube since it doesn't play ads or contribute to [TEI's] view counts.***" RBN Decl., ¶ 12, Exs. 51, 53.

---

[23] The H3Snark Mods falsely claim the links in the 1/30/25 Post and 1/31/25 Posts did not link to "any specific video or stream" but the creators' homepages. Dkt. No. 1, p. 27:9-10 (citing Dkt. No. 8, ¶¶ 34-35, 40, 130). This is an attempt to exploit the Court's potential lack of familiarity with Twitch. A Twitch streamer's live broadcast to the public is only available on their homepage; only videos of prior streams have a designated URL. RBN Decl., ¶¶ 38(b), 40, Ex. 62.

Further reinforcing that the H3Snark Mods intended to achieve an unlawful purpose is the timing of the 1/31/25 Posts. The First 1/31/25 Post directing users to Denims' Watch Party of the Countdown Episode was posted at 12:33 p.m. PST – *i.e.*, a few minutes after the Countdown Episode began. Dkt. No. 8, ¶ 33; RBN Decl., ¶ 36; JKD, ¶ 30. The Second 1/31/25 Post directing users to Denims' Watch Party of *The Nuke* was posted at 1:43 p.m. PST – *i.e.*, 13 minutes after *The Nuke* was made publicly available. Dkt. No. 8, ¶ 38; RBN Decl., ¶ 36; JKD, ¶ 30. By offering alternatives for the Works before anyone could finish watching them independently, the H3Snark Mods intended users to view Denims' Watch Party in lieu of the Works.

Therefore, TEI has made its *prima facie* showing of contributory infringement.

## V.     THE BALANCING TEST FAVORS DISCLOSURE

As a threshold matter, because TEI "has successfully demonstrated a *prima facie* claim of copyright infringement and the [H3Snark Mods] have not demonstrated fair use, the [H3Snark Mods] have little, if any, First Amendment protection against disclosure of their identities." *Baugher*, 2021 WL 4942658, *5; *see also Agdal*, 2025 WL 81594, *5 (since the speech at issue "infringe[s]" TEI's "copyright in the Video … the speech at issue is entitled to only minimal First Amendment protection."); *see also In re DMCA Subpoena to Reddit*, 441 F.Supp.3d at 882 (balance of the equities is not required because "the First Amendment does not protect anonymous speech that infringes copyright"). The balancing test considers four factors:

> [W]hether (1) the subpoena seeking the information was issued in good faith and not for any improper purpose, (2) the information sought relates to a core claim or defense, (3) the identifying information is directly and materially relevant to that claim or defense, and (4) information sufficient to establish or to disprove that claim or defense is unavailable from any other source.

*Cognosphere*, 2024 WL 4227594, *3.

**Good faith**: When a copyright owner "seek[s] evidence to enforce those rights, in a circumstance of what appears to be direct copyright infringement typical of piracy, is a hallmark of good faith." *Cognosphere*, 2024 WL 4227594, *7. "Courts found that establishing a *prima facie* case of copyright infringement should weigh in favor of discovery absent other convincing reasons." *Id.*; *cf. In re Reddit,* 2024 WL 477519, *3 (N.D. Cal. Feb. 7, 2024) ("A higher standard for unmasking a non-party witness exists than for unmasking a potential defendant").

TEI's sole purpose is to enforce its copyrights against the H3Snark Mods in the lawsuits against Denims, Frogan and Kaceytron. JKD, ¶ 5; RBN Decl., ¶ 75. Neither TEI nor its owners have any intention to pursue any other claim against the H3Snark Mods at this time. *Id.* Further, the Kleins have made multiple attempts to ameliorate the H3Snark Mods' concerns by: (1) offering to not speak about the H3Snark Mods if they abstain from talking about them (as it would remove the need to defend themselves); (2) not publicly discuss their names; and (3) encouraging their audience to refrain from contacting the H3Snark Mods in any manner. JKD, ¶ 5; RBN Decl., ¶ 70, 73-74, Ex. 67. Clearly, these gestures of good faith did not satisfy the H3Snark Mods.

The H3Snark Mods devote much of their Motion and almost all of their declarations to argue TEI and the Kleins exhibit bad faith. The declarations of the Kleins and TEI's counsel refute these assertions and demonstrate these claims based on intentional misrepresentations and omissions that fail to withstand scrutiny. JKD, ¶¶ 25, 35-97; RBN Decl, ¶¶ 3-40, 56, 79-80. Far from showing that TEI or the Kleins are unable to take their "criticism," the H3Snark Mods reveal that they are the ones adverse to criticism by grossly distorting the factual record to paint the Kleins addressing, disputing and refuting their "criticism" as "harassment," "abuse," and "threats."

**Core to claim/Directly and materially relevant**: Courts have recognized that "seeking information necessary to start any litigation or enforcement proceedings (*i.e.*, the identities of the persons behind the [anonymous] accounts)" is "information sought [that] is directly and materially relevant to a core claim." *Cognosphere*, 2024 WL 4227594, *7-8. Indeed, such information is "critical to the claim, because without the information," a plaintiff "has no starting point for whom to name as a defendant." *Id.*, *8. Therefore, the information sought in the subpoenas are absolutely essential for TEI to pursue its claim of contributory infringement. RBN Decl., ¶ 76.

**No alternatives**: No alternative means exist to identify the H3Snark Mods. RBN Decl., ¶ 77. TEI has employed private investigators and even was able to find an informant within the H3Snark Mods – but still could not find their identities or location. *Id.* Therefore, there is no alternative to obtain the personal identifying information of the H3Snark Mods.

In sum, the balance of the equities favor TEI and not the H3Snark Mods.

## VI.  A PROTECTIVE ORDER IS UNWARRANTED

"The normal presumption in litigation is that parties must use their real names." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate* ("*Kamehameha*"), 596 F.3d 1036, 1042 (9th Cir. 2010). Parties may proceed pseudonymously only "in the unusual case when nondisclosure of the party's identity is necessary … to protect a person from harassment, injury, ridicule or personal embarrassment." *Does 1 Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-68 (9th Cir. 2000) (internal quotes omitted).

Courts "must balance five factors" to determine whether proceeding pseudonymously is proper: "(1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears, … (3) the anonymous party's vulnerability to such retaliation, (4) the prejudice to the opposing party, and (5) the public interest." *Kamehameha*, 596 F.3d at 1042.

Here, the H3Snark Mods have failed to identify any threat directed at them. Rather, any fears they have articulated are based on falsehoods, gross distortions of the truth, rank speculation and the Kleins attempting to defend themselves. JKD, ¶¶ 33-97, RBN Decl, ¶¶ 3-40, 56, 79-80. Further, as discussed in Section V regarding good faith, the Kleins have made multiple attempts to ameliorate the H3Snark Mods' concerns – but the H3Snark Mods have rejected these offers.

The prejudice to TEI is readily apparent. By disclosing the H3Snark Mods' identity to the Court only, it severely hampers TEI's ability to conduct discovery and proceed with the case. RBN Decl., ¶ 78; *see also Doe 1 v. GitHub*, 672 F.Supp.3d 837, 854 (N.D. Cal. 2023) ("pseudonymity may pose certain logistical challenges during discovery").

The H3Snark Mods' actual concern is transparent: they wish to avoid being treated with the same courtesy with which they treated the Kleins. They should not be allowed to enjoy anonymity based on making intentional falsehoods to this Court. As the H3Snark Mods themselves admit, there is tremendous public interest in the outcome of this Motion. It addresses the public scourge of copyright infringement as a form of cyberbullying. Justice Louis D. Brandeis stated it best: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Therefore, the H3Snark Mods request for protective order should be denied.

1

**VII.** **CONCLUSION**

2

     For the reasons set forth above, TEI respectfully requests this Court to deny the Motion.

3

    Dated: October 20, 2025                **HEAH BAR-NISSIM LLP**

4

5

                                     By  /s/ ROM BAR-NISSIM
                                         ROM BAR-NISSIM

6

                                         Attorneys for Respondent/Plaintiff Ted
                                         Entertainment, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.